[No. S171895. July 1, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
HONORIO MORENO HERRERA, Defendant and Appellant.

614

### COUNSEL

Waldemar D. Halka, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lynne G. McGinnis, Steven Oetting and Kelley A. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**BAXTER, J.**—Defendant Honorio Moreno Herrera was a member of the criminal street gang known as "Krazy Proud Criminals" or "KPC." In June 2005, he and two fellow KPC members drove into the territory of a rival gang called "Logan," and shot and killed Erick Peralta. In June 2006, Jose Portillo testified at a preliminary hearing that defendant confessed to the shooting. Defendant was then charged by information with one count of first degree murder, with a criminal street gang special circumstance and two gang-related enhancements. He was also charged with one count of street terrorism.

By the time defendant's case was ready for trial in May 2007, Portillo could not be found. The prosecution filed a pretrial motion to admit Portillo's preliminary hearing testimony, contending he was unavailable as a witness. After hearing evidence that Portillo had been deported to El Salvador in September 2006, and that El Salvador and the United States had no treaty providing for his extradition to this country to testify as a witness, the trial court ruled Portillo unavailable and allowed his testimony to be read to the jury. The Court of Appeal reversed, concluding the prosecution had failed to establish Portillo's unavailability as required by the confrontation clauses of the federal and state Constitutions and the Evidence Code. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; Evid. Code, §§ 1290, 1291, 240, subd. (a)(4), (5).)

Consistent with decisions of the United States Supreme Court and our state courts, we hold that the prosecution's showing of Portillo's unavailability, which was based on undisputed testimony, satisfied constitutional and state law requirements. Accordingly, we reverse the judgment of the Court of Appeal, and remand the matter to that court for further proceedings consistent with our opinion.

## Factual and Procedural Background

About 10:30 p.m. on June 19, 2005, Erick Peralta and his cousin Efren Enriquez were walking on Spurgeon Street in Santa Ana toward a convenience store. According to Enriquez, a blue four-door car with three people passed them and stopped. A man exited the car and asked where they were from. Enriquez put his hand up and said, "What's up?" as he and Peralta kept walking. A second man with a gun got out of the car and fired at them once. Peralta was shot in the head and killed. The two men got back in the car, someone yelled out "KPC," and the car drove off.

Santa Ana Police Detective Richard Ashby interviewed Enriquez shortly after the shooting. Enriquez was shown photographs of active KPC gang members, but he did not identify anyone as the suspects.

Three months later, on September 17, 2005, Jose Portillo, a former KPC member, was driving a car with defendant as one of the passengers. Portillo sped away when he saw the police. The police gave chase, and Portillo was arrested for felony evading. Defendant was arrested for attempting to flee from Portillo's car.

On September 19, 2005, Portillo told Detective Ashby that defendant had bragged to him about shooting a person who identified himself as a Logan gang member. Defendant had said two people, a guy from "Clown Town" and another "youngster" he did not identify, were with him at the time of the shooting. Portillo also described the car used in the shooting as a dark purple Chevrolet Beretta. Portillo had previously seen defendant driving this car and had seen him with Luis Estudillo and Paul Del La Cruz, additional suspects in the case.

On or about November 19, 2005, defendant had a two-hour interview with Detective Ashby after waiving his right to an attorney and right to remain silent. Defendant initially denied knowledge of the shooting, but then admitted witnessing it. He named "Striker," an Anaheim "Clown Town" gang member, as the driver involved in the crime, but refused to name the shooter.

Several months later, on June 19, 2006, Portillo testified at defendant's preliminary hearing. According to Portillo, defendant told Portillo in June of 2005 that defendant was the shooter who killed Peralta. Defendant was bound over for trial and charged by information with one count of first degree murder (Pen. Code, § 187, subd. (a)), with a criminal street gang special circumstance (*id.*, § 190.2, subd. (a)(22)), a gang-benefit enhancement (*id.*, § 186.22, subd. (b)), and an enhancement for gang member vicarious discharge of a firearm causing death (*id.*, § 12022.53, subds. (d), (e)(1)). Defendant was also charged with one count of street terrorism. (*Id.*, § 186.22, subd. (a).)

Trial was scheduled for March 7, 2007, but it was continued two months to May 21 because neither side was ready for trial. On and after May 21, 2007, the trial was trailed three times to May 30.

On May 30, 2007, the prosecution filed a motion to admit Portillo's preliminary hearing testimony. Claiming that Portillo was unavailable to testify at trial, the prosecution requested a hearing on the issue of due diligence. According to the motion, Portillo had been in custody on an unrelated matter at the time of defendant's June 19, 2006, preliminary hearing, and he agreed to provide truthful testimony in exchange for a more lenient sentence. After testifying at the preliminary hearing, Portillo entered a plea in the unrelated matter and was sentenced. Records maintained by the United States Department of Homeland Security indicated that Portillo was later flown to El Salvador, his country of origin, and released.

That same day, May 30, 2007, the trial court held an evidentiary hearing on the prosecution's motion. Investigator Ed Wood of the Orange County District Attorney's Office testified regarding his efforts to secure Portillo's presence for trial and his communications with the Department of Homeland Security concerning Portillo's whereabouts. Wood said he began looking for Portillo the Friday before, on May 25. He started by running Portillo's name through the law enforcement database and discovered two outstanding "no bail" warrants for his arrest.[1] Wood then contacted Detective Ashby and asked him to make out "a BOLO or a wanted flyer" for Portillo. The wanted flyer, which was disseminated at least regionally to all law enforcement, resulted in no helpful information. That afternoon (May 25), Wood went to Portillo's last known residence at an apartment unit in Santa Ana. A woman lived in the unit with her father and daughter, but she did not recognize Portillo when shown his photograph.

Wood also obtained a "Local Arrest Record" printout listing two tele-phone numbers for Portillo's family members or friends, but he ascertained those numbers had been disconnected or changed. Wood additionally asked Detective Ashby to try contacting Portillo's friends and family, in case Ashby had information in the database that was not accessible to Wood.

Around 3:00 or 3:30 p.m. that same Friday, Wood contacted Special Agent Mark Johnston of the United States Department of Homeland Security. When asked if Portillo had been deported, Johnston checked and confirmed he had been deported to El Salvador, his country of origin. The deportation had

---

[1] The prosecutor informed the court that he personally spoke with the Orange County Probation Department and ascertained that one arrest warrant had been issued in April 2007 for Portillo's failure to report to probation after his release from custody in June 2006. The record is unclear as to the source and date of the other warrant.

occurred more than eight months earlier, on September 11, 2006. Wood determined that Portillo was released from custody from the Orange County jail on June 24, 2006, and assumed that he "went into" custody of federal immigration authorities around that time.

At 8:30 a.m. on Tuesday, May 29, 2007, Wood spoke with Art Zorilla, an investigator in the foreign prosecution unit of the Orange County District Attorney's Office. At Wood's request, Zorilla contacted INTERPOL, the agency in El Salvador that would search a database for Portillo and send officers out. As of 1:00 p.m. on Wednesday, May 30, Wood had heard nothing from El Salvador about Portillo. Zorilla, however, informed Wood that even if Portillo could be located in El Salvador, that country had no treaty with the United States and would not extradite him.[2]

After Wood concluded his testimony, the prosecution reminded the court that Portillo "entered into an agreement" before testifying at the preliminary hearing. The prosecution offered to stipulate that agreement into evidence, as well as any moral turpitude prior conviction that would have been available to the defense for impeachment purposes had Portillo been present to testify. Finding the prosecution acted with "due diligence" in attempting to secure Portillo's presence, the trial court permitted the use of his preliminary hearing testimony at trial.

A jury convicted defendant of the charged crimes and found true the alleged enhancements and the gang special circumstance allegation. He was sentenced to life in prison without the possibility of parole.

A divided Court of Appeal reversed the judgment, concluding that admission of Portillo's preliminary hearing testimony at trial was reversible error.

### DISCUSSION

The central issue is whether admission of Portillo's preliminary hearing testimony was erroneous or in violation of defendant's constitutional right of confrontation.

■ A criminal defendant has the right, guaranteed by the confrontation clauses of both the federal and state Constitutions, to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) The right of confrontation "seeks 'to ensure that the defendant is able to conduct a

---

[2] Strictly speaking, the United States and El Salvador did have an extradition treaty. (Treaty of Extradition Between the United States of America and El Salvador, Apr. 18, 1911, 37 Stat. 1516, T.S. No. 560.) That treaty, however, would not have permitted Portillo's extradition or return to the United States to testify as a witness at defendant's trial.

"personal examination and cross-examination of the witness, in which [the defendant] has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." ' (*People v. Louis* (1986) 42 Cal.3d 969, 982 [232 Cal.Rptr. 110, 728 P.2d 180], quoting *Mattox v. United States* (1895) 156 U.S. 237, 242–243 [39 L.Ed. 409, 15 S.Ct. 337].) To deny or significantly diminish this right deprives a defendant of the essential means of testing the credibility of the prosecution's witnesses, thus calling 'into question the ultimate " 'integrity of the fact-finding process.' " ' (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295 [35 L.Ed.2d 297, 93 S.Ct. 1038].)" (*People v. Cromer* (2001) 24 Cal.4th 889, 896–897 [103 Cal.Rptr.2d 23, 15 P.3d 243] (*Cromer*).)

■ Although important, the constitutional right of confrontation is not absolute. (*Chambers v. Mississippi, supra,* 410 U.S. at p. 295; *Cromer, supra,* 24 Cal.4th at p. 897.) "Traditionally, there has been 'an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant [and] which was subject to cross-examination . . . .' (*Barber v. Page* [(1968) 390 U.S. 719,] 722 [20 L.Ed.2d 255, 88 S.Ct. 1318].)" (*Cromer, supra,* at p. 897.) Pursuant to this exception, the preliminary hearing testimony of an unavailable witness may be admitted at trial without violating a defendant's confrontation right. (*People v. Seijas* (2005) 36 Cal.4th 291, 303 [30 Cal.Rptr.3d 493, 114 P.3d 742].)

This traditional exception is codified in the California Evidence Code.[3] (*People v. Friend* (2009) 47 Cal.4th 1, 67 [97 Cal.Rptr.3d 1, 211 P.3d 520].) Section 1291, subdivision (a)(2), provides that "former testimony," such as preliminary hearing testimony,[4] is not made inadmissible by the hearsay rule if "the declarant is unavailable as a witness," and "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." Thus, when the requirements of section 1291 are met, the admission of former testimony in evidence does not violate a defendant's constitutional right of confrontation. (*People v. Friend,* at p. 67.)

There is no dispute that defendant was a party to the action in which Portillo's former testimony was given, and that he actually exercised his right

---

[3] All further statutory references are to this code unless otherwise indicated.

[4] For purposes of the Evidence Code, former testimony includes "testimony given under oath" in "a former hearing or trial of the same action." (§ 1290, subd. (a).)

to cross-examine Portillo with the requisite interest and motive. The question is whether Portillo was unavailable as a witness.

 A witness who is absent from a trial is not "unavailable" in the constitutional sense unless the prosecution has made a "good faith effort" to obtain the witness's presence at the trial. (*Barber v. Page, supra,* 390 U.S. at pp. 724–725 (*Barber*).) The United States Supreme Court has described the good faith requirement this way: "The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), 'good faith' demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. 'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness. [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." (*Ohio v. Roberts* (1980) 448 U.S. 56, 74 [65 L.Ed.2d 597, 100 S.Ct. 2531], disapproved on another point in *Crawford v. Washington* (2004) 541 U.S. 36, 60–68 [158 L.Ed.2d 177, 124 S.Ct. 1354].)

 Our Evidence Code features a similar requirement for establishing a witness's unavailability. Under section 240, subdivision (a)(5) (section 240(a)(5)), a witness is unavailable when he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised *reasonable diligence* but has been unable to procure his or her attendance by the court's process." (Italics added.) The term "[r]easonable diligence, often called 'due diligence' in case law, ' "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character." ' " (*People v. Cogswell* (2010) 48 Cal.4th 467, 477 [106 Cal.Rptr.3d 850, 227 P.3d 409].) Considerations relevant to the due diligence inquiry "include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored." (*People v. Wilson* (2005) 36 Cal.4th 309, 341 [30 Cal.Rptr.3d 513, 114 P.3d 758] [relying on *Cromer, supra,* 24 Cal.4th at p. 904].) In this regard, "California law and federal constitutional requirements are the same . . . ." (*People v. Valencia* (2008) 43 Cal.4th 268, 291–292 [74 Cal.Rptr.3d 605, 180 P.3d 351].)

 Before analyzing the good faith and due diligence requirements in depth, we briefly address section 240, subdivision (a)(4) (section 240(a)(4)), which provides that a witness is unavailable when he or she is "[a]bsent from the hearing and the court is unable to compel his or her attendance by its process." In contrast to section 240(a)(5), section 240(a)(4) makes no mention of a "reasonable diligence" requirement, thus indicating the Legislature's intent to dispense with such a showing in those cases where the court has no

power to compel the witness's attendance. Although the Attorney General contends on appeal that the terms of section 240(a)(4) have been satisfied, neither the prosecution nor the trial court purported to predicate Portillo's unavailability on that provision. Even assuming, however, that Portillo was unavailable under section 240(a)(4), unavailability in the constitutional sense nonetheless requires a determination that the prosecution satisfied its obligation of good faith in attempting to obtain Portillo's presence. With this in mind, we shall assess the reasonableness of the prosecution's actions.

As indicated, to establish unavailability, the prosecution must show that its efforts to locate and produce a witness for trial were reasonable under the circumstances presented. (*Ohio v. Roberts, supra,* 448 U.S. at p. 74; *People v. Smith* (2003) 30 Cal.4th 581, 609 [134 Cal.Rptr.2d 1, 68 P.3d 302] (*Smith*).) We review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard (*Cromer, supra,* 24 Cal.4th at p. 902), and independently review whether the facts demonstrate prosecutorial good faith and due diligence (*id.* at pp. 902–903).

In this case, we must consider what prosecutorial efforts will sustain a finding of unavailability when the absent witness was not in this jurisdiction but in another country. We start by consulting two decisions of the United States Supreme Court: *Barber, supra,* 390 U.S. 719, and *Mancusi v. Stubbs* (1972) 408 U.S. 204 [33 L.Ed.2d 293, 92 S.Ct. 2308] (*Mancusi*).

In *Barber, supra,* 390 U.S. 719, the issue was whether the petitioner was deprived of his constitutional right of confrontation at his trial in Oklahoma for armed robbery, in which the principal evidence against him consisted of the preliminary hearing testimony of a witness who at the time of trial was serving a federal prison term in Texas. (*Id.* at p. 720.)

*Barber* began by noting the state had made "absolutely no effort to obtain the presence of [the witness] at trial other than to ascertain that he was in a federal prison outside Oklahoma." (*Barber, supra,* 390 U.S. at p. 723.) Although acknowledging that, at one time, a showing of mere absence from the jurisdiction might have sufficed to demonstrate unavailability, *Barber* observed that times had changed. By 1968, the "increased cooperation between the States themselves and between the States and the Federal Government" in making witnesses available for trial had changed the confrontation clause analysis. (*Ibid.*) As relevant there, a federal statute empowered federal courts to issue appropriate writs at the request of state prosecutorial authorities, and federal prison policy also supported state writ procedures. (*Id.* at p. 724; see also *id.* at pp. 723–724, fn. 4 [describing procedures by which a state could secure the attendance of nonincarcerated and state-incarcerated witnesses located in a sister state].)

In light of such developments, *Barber* held the prosecution failed to establish the incarcerated witness's unavailability because it had made absolutely no effort to obtain his attendance by the cooperation of the federal authorities or a federal court. (*Barber, supra,* 390 U.S. at p. 725.) As *Barber* explained, "[S]o far as this record reveals, the sole reason why [the witness] was not present to testify in person was because the State did not attempt to seek his presence. *The right of confrontation may not be dispensed with so lightly.*" (*Ibid.,* italics added.)

*Mancusi, supra,* 408 U.S. 204, decided four years later, discussed and distinguished *Barber, supra,* 390 U.S. 719, in the context of a nonincarcerated witness residing outside the United States. In *Mancusi,* the petitioner challenged the use of a prior Tennessee murder conviction for sentencing purposes in a New York criminal proceeding, on the ground the Tennessee conviction was obtained in violation of his right of confrontation. (*Mancusi, supra,* 408 U.S. at p. 205.) At the petitioner's first Tennessee trial, the slain victim's husband, Alex Holm, testified for the prosecution, resulting in a murder conviction. That conviction was reversed, and the petitioner was retried. At the retrial, the prosecution sought to have Holm declared unavailable, based on the testimony of Holm's son that Holm, who was a naturalized American citizen, had left the United States and become a permanent resident of his native Sweden. The trial court permitted Holm's testimony from the first trial to be read to the jury, and the petitioner was again convicted of murder. (*Id.* at pp. 207–209.)

*Mancusi* concluded the use of the second Tennessee conviction did not violate the petitioner's right of confrontation. *Mancusi* observed that in *Barber,* the uniform act to secure the attendance of witnesses from without a state, the availability of appropriate federal writs, and the policy of federal prisons to honor writs issued out of state courts, all supported *Barber*'s conclusion that "the State had not met its obligations to make a good-faith effort to obtain the presence of the witness merely by showing that [the witness] was beyond the boundaries of the prosecuting State." (*Mancusi, supra,* 408 U.S. at p. 212.) In *Mancusi,* however, the witness was not simply absent from Tennessee but was a permanent resident of another country. (*Id.* at p. 211.) *Mancusi* found that distinction significant, emphasizing: "There have been . . . no corresponding developments in the area of obtaining witnesses between this country and foreign nations." (*Id.* at p. 212.) On this point, *Mancusi* noted that neither the existing case law nor the statutory language of the then effective version of 28 United States Code section 1783(a) would

have permitted a federal court to subpoena a United States citizen residing in a foreign country for testimony in a state felony trial. (*Mancusi, supra,* 408 U.S. at pp. 211–212.)[5]

Under those circumstances, "good faith" did not require additional efforts by the prosecution. As far as the high court was concerned, "[u]pon discovering that Holm resided in a foreign nation, the State of Tennessee, so far as this record shows, was powerless to compel his attendance at the second trial, either through its own process or through established procedures depending on the voluntary assistance of another government." (*Mancusi, supra,* 408 U.S. at p. 212.) Accordingly, *Mancusi* concluded the state trial court's determination as to Holm's unavailability should stand. (*Mancusi, supra,* 408 U.S. at pp. 212–213.)

 Subsequent to *Mancusi,* the Supreme Court stated in *Ohio v. Roberts, supra,* 448 U.S. 56, that "if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation." (*Id.* at p. 74.) This statement did not alter or detract from *Mancusi*'s analysis that when the prosecution discovers the desired witness resides in a foreign nation, and the state is powerless to obtain the witness's attendance, either through its own process or through established procedures, the prosecution need do no more to establish the witness's unavailability. Indeed, the Supreme Court cited *Mancusi* as providing "significant support for a conclusion of good-faith effort" in *Ohio v. Roberts.* (*Id.* at p. 76.)

California decisions are in accord. In *People v. Ware* (1978) 78 Cal.App.3d 822 [144 Cal.Rptr. 354], a sexual assault victim testified at the defendant's preliminary hearing, and then returned home to Spain. (*Id.* at p. 827.) Despite having the victim's address and telephone number in Spain, the prosecution made no attempt to obtain her presence at trial. (*Id.* at p. 829.) Nonetheless, *Ware* upheld the admissibility of the victim's videotaped preliminary hearing testimony. (*Id.* at pp. 837–838.) While acknowledging that mere absence from the jurisdiction was no longer sufficient to dispense with the right of confrontation (*id.* at p. 831), *Ware* found its facts comparable to those in *Mancusi,* in that no alternative means were available at that time to secure the victim's attendance at trial (*Ware,* at p. 837).

*People v. St. Germain* (1982) 138 Cal.App.3d 507 [187 Cal.Rptr. 915] (*St. Germain*) provides an example where unavailability was demonstrated with regard to one witness residing in another country at the time of trial, but

---

[5] *Mancusi* declined to consider a 1964 amendment to 28 United States Code section 1783 because it was not available to the Tennessee authorities at the time of the petitioner's retrial. (*Mancusi, supra,* 408 U.S. at p. 212, fn. 2.)

not as to another witness residing in the same foreign country. *St. Germain* determined that a witness named Kowsoleea was properly declared unavailable, where it was shown he was a citizen and resident of the Netherlands at the time of trial, because no court process could compel the attendance of a foreign national and no treaty provision or compact with the Netherlands existed. (*Id.* at pp. 517–518.) Notably, *St. Germain* came to the opposite conclusion for the other witness, named Smith. Although Smith lived in the Netherlands with Kowsoleea at the time of trial, she had a "green card," which meant she was a permanent resident of the United States. (*Id.* at p. 516.) Given Smith's permanent resident status, the prosecution "had available the remedy of a subpoena to be issued by the federal courts requiring the appearance as a witness before a 'body designated by it'—here the superior court jury—'of a national or resident of the United States who is in a foreign country. . . .' " (*Id.* at p. 517, quoting 28 U.S.C. § 1783.)[6] Because the prosecution made no attempt to secure Smith's presence through this federal procedure, *St. Germain* concluded she was not unavailable and found her former testimony inadmissible. (*St. Germain*, at p. 517.)

*People v. Sandoval* (2001) 87 Cal.App.4th 1425 [105 Cal.Rptr.2d 504] (*Sandoval*) represents a more recent application of the *Barber/Mancusi* analysis. There, the absent witness was deported to his native Mexico after testifying at the defendant's preliminary hearing. (*Id.* at p. 1432.) The prosecution kept in contact with the witness, and ascertained his willingness to return for the trial if given money to make the trip to California, including $100 to pay for obtaining a passport and visa for legal entry into the United States. (*Ibid.*) Ultimately, the prosecution decided not to provide financial assistance to the witness, and did nothing more to secure his attendance at the trial. (*Ibid.*)

Although acknowledging that the trial court had no power to compel the witness's appearance at trial (*Sandoval, supra*, 87 Cal.App.4th at p. 1434), *Sandoval* found it highly significant that the United States and Mexico had a treaty, which became effective in 1991, providing for cooperation in the prosecution of crimes and mutual assistance in obtaining witness testimony. (*Sandoval*, at pp. 1439–1440.) Specifically, the treaty outlined several cooperative methods by which a Mexican resident's testimony could be obtained, either in California or in Mexico. (*Id.* at p. 1439.)[7] This development sufficiently distinguished the situation in *Sandoval* from that which existed in

---

[6] The version of 28 United States Code section 1783 that applied in *St. Germain* differed substantially from the version existing at the time of the relevant events in *Mancusi*. (Compare *St. Germain, supra*, 138 Cal.App.3d at p. 517, fn. 6, with *Mancusi, supra*, 408 U.S. at pp. 211–212.)

[7] *Sandoval* described the treaty as follows. "Article 7 allows a prosecutor in the United States to request that a witness in Mexico be compelled by Mexican authorities to appear and testify, but only in Mexico. Article 8 provides for the transportation to the United States of a

1972 when *Mancusi* observed that the United States had *not* yet made agreements with foreign countries similar to the interstate agreements found in *Barber.* (*Sandoval, supra,* 87 Cal.App.4th at p. 1440.) Because the treaty with Mexico represented such an· agreement, the prosecution's failure to pursue any of the cooperative methods outlined in the treaty was fatal to its showing of good faith: "Consideration of the options available to the prosecution and the extent to which the prosecution attempted to use these alternatives to obtain [the witness's] presence establishes that the prosecution did not make a reasonable, good-faith effort." (*Id.* at p. 1444.) Accordingly, *Sandoval* concluded the absent witness residing in Mexico was not unavailable in the constitutional sense.[8]

Finally, *Smith, supra,* 30 Cal.4th 581, involved a situation where a Japanese foreign exchange student named Fukumoto testified at the defendant's preliminary hearing, and then returned to Japan, where the prosecution contended he resided at the time of trial. (*Id.* at p. 608.) The defendant did not dispute that Fukumoto would have been unavailable if he was actually in Japan, but he challenged the prosecution's use of hearsay to establish that fact. (*Id.* at p. 609.) The trial court concluded Fukumoto was unavailable because he was a Japanese resident and therefore not subject to the court's process, but it made no specific finding that the prosecution had exercised due diligence to try to procure Fukumoto's attendance. (*Id.* at p. 610.)

Applying the independent review standard to the undisputed facts, *Smith* found the prosecution satisfied its burden of showing due diligence upon obtaining "three important pieces of information: (1) Fukumoto testified at the preliminary hearing that he was a Japanese national and intended to

---

person in custody in Mexico to testify if the person consents and Mexico has no reasonable basis to deny the request. And article 9 allows the prosecution to request the assistance of Mexican authorities to invite a person in Mexico to come to California and testify and to inform the person concerning the extent to which expenses will be paid." (*Sandoval, supra,* 87 Cal.App.4th at p. 1439, fns. omitted.)

[8] We note *Sandoval* suggested that good faith also required the prosecution to go beyond the treaty in trying to secure the absent witness's presence. That part of its discussion, however, was based on additional facts not presented here, i.e., there, the deported witness had previously disclosed at the preliminary hearing that he was in the country illegally (*Sandoval, supra,* 87 Cal.App.4th at p. 1429), and the prosecution actually located him in Mexico and received assurance he would cooperate if provided the necessary funds (*id.* at pp. 1441–1442). *Sandoval* observed that, in the face of such circumstances, "[t]he prosecution could have assisted [the witness] without reference or resort to the Treaty." (*Id.* at p. 1442.) Here, the prosecution was unable to establish contact with the absent witness. We therefore need not and do not decide what additional efforts, if any, might be constitutionally required to establish good faith in the event contact with an absent witness is made. (See *Smith, supra,* 30 Cal.4th at p. 611, fn. 6 [declining to reach issue whether "prosecution was required to do more to procure [a witness's] attendance, such as request that he come voluntarily to testify"]; cf. *People v. Martinez* (2007) 154 Cal.App.4th 314 [64 Cal.Rptr.3d 580]; *People v. Denson* (1986) 178 Cal.App.3d 788 [224 Cal.Rptr. 63].)

leave the country several months before the trial occurred, (2) Fukumoto's host parent told the district attorney that Fukumoto had left the country, and (3) the district attorney's investigator had called the telephone number in Japan that the records showed was Fukumoto's number and heard a voice at the other end say he was Fukumoto. This information may have been legally incompetent, due to the hearsay rule, to show that Fukumoto was actually in Japan. But it sufficed to show that the prosecution made reasonable efforts to locate him and that further efforts to procure his attendance would be futile." (*Smith, supra,* 30 Cal.4th at pp. 610–611.)[9]

■ The foregoing authorities make clear that, when a criminal trial is at issue, unavailability in the constitutional sense does not invariably turn on the inability of the state court to compel the out-of-state witness's attendance through its own process, but also takes into consideration the existence of agreements or established procedures for securing a witness's presence that depend on the voluntary assistance of another government. (*Mancusi, supra,* 408 U.S. at pp. 211–213.) Where such options exist, the extent to which the prosecution had the opportunity to utilize them and endeavored to do so is relevant in determining whether the obligations to act in good faith and with due diligence have been met.[10] (*Barber, supra,* 390 U.S. at pp. 723–725; *Sandoval, supra,* 87 Cal.App.4th at p. 1444; *St. Germain, supra,* 138 Cal.App.3d at p. 517.)

Mindful of the foregoing authorities, we now consider whether the admission of Portillo's preliminary hearing testimony at trial was erroneous or violated defendant's constitutional right of confrontation. In assessing whether or not Portillo was properly found unavailable, we review the trial court's factual findings under the substantial evidence standard and independently review whether the facts demonstrate prosecutorial good faith and due diligence. (*Cromer, supra,* 24 Cal.4th at pp. 902–903.)

Here, the evidence concerning Portillo's unavailability as a witness was as follows. District attorney investigator Ed Wood took the stand on Wednesday, May 30, 2007, and testified that on May 25, the Friday before, he learned from Special Agent Mark Johnston of the United States Department of Homeland Security that Portillo had been deported to his native El Salvador in September 2006. On Tuesday, May 29, at 8:30 a.m., Wood requested that

[9] In *Smith, supra,* 30 Cal.4th 581, there was no indication of an applicable treaty or agreement between Japan and the United States.

[10] Relying on concessions made by the defendant, one California decision stated bluntly that no showing of due diligence is required if the witness is a foreign citizen outside of the United States at the time of trial. (*People v. Denson, supra,* 178 Cal.App.3d at pp. 791, 793.) Unavailability in the constitutional sense, however, requires a showing that the prosecution acted in good faith, and the lengths to which the prosecution must go to produce a witness in a given set of circumstances is a question of reasonableness.

the foreign prosecution investigator at his office, Art Zorilla, contact law enforcement authorities in El Salvador in an attempt to locate Portillo in that country. Zorilla did so, but Portillo was not found. Zorilla informed Wood that, even if Portillo could be located in El Salvador, there was no treaty between the two countries providing for Portillo's extradition or return to the United States. (See, *ante*, fn. 2.) Wood had made additional efforts to locate Portillo at the residence and in the region where he last lived in California and to track down any information available in the law enforcement database. Wood discovered there were warrants out for Portillo's arrest, but ascertained no information indicating that Portillo had returned to California. Unlike the situation in *Smith, supra*, 30 Cal.4th 581, defendant made no hearsay objection to any of Wood's testimony.

After hearing this testimony, the trial court determined that Portillo "certainly was deported." The court further stated that "it would be speculative to come up with further efforts that could be fruitful in obtaining his presence, especially given the testimony we heard with regard to the relationship between El Salvador and this country with regard to extradition." Concluding the prosecution had acted with due diligence, the trial court ruled Portillo's preliminary hearing testimony admissible.

█ Reviewing the record, we observe that Wood's testimony amply supported the trial court's finding that Portillo had been deported to his native El Salvador in September 2006, about three months after the preliminary hearing and more than eight months before defendant's trial. Wood's testimony also provided substantial support for the court's determination that Portillo was not in California at the time of trial, but was in El Salvador and therefore beyond the court's own process.[11] There was no dispute that attempts to locate Portillo in El Salvador proved unsuccessful. Likewise, there was no dispute that even if Portillo could be found there, the United States and El Salvador had no agreement or treaty providing for an alternative means to compel or facilitate his attendance at defendant's trial. We therefore conclude, consistent with the United States Supreme Court and California decisions discussed above, that the prosecution fulfilled its obligation of good faith and due diligence under the circumstances, that Portillo was unavailable as a witness, and that therefore admission of his preliminary hearing testimony at trial was proper.

In finding to the contrary, the Court of Appeal emphasized that the prosecution made no effort to locate Portillo until the last business day before defendant's trial was scheduled to start, thus leaving insufficient time for an

---

[11] Defendant complains no effort was made to contact the consulate or embassy of El Salvador to confirm Portillo's presence and/or residence in that country. As indicated, defendant made no objection whatsoever to Wood's testimony at the hearing.

adequate investigation of his whereabouts.[12] The court attributed no significance to Portillo's deportation or to the absence of any applicable treaty or agreement between El Salvador and the United States, instead reasoning: "Portillo was deported to El Salvador in September 2006, presumably a not unexpected event. But even if he had not been deported, what was the likelihood he would still live in the same Civic Center Drive apartment he occupied a year earlier? What was the probability that the flyer disseminated one business day before the trial was scheduled to start would have resulted in Portillo's arrest in time for him to testify at the trial? It took Wood less than a day to learn that Portillo had been deported. Had this been discovered a few weeks before the trial, efforts could have been made to obtain his return to this country and, if such efforts proved unsuccessful, the diligence requirement might have been satisfied. Furthermore, it is not unheard of that a deported felon returns to the United States. Again, the prosecution did not give itself enough time to permit an adequate investigation of his whereabouts."

The Court of Appeal's analysis is flawed in several respects. First, its characterization of Portillo's deportation as a "not unexpected event" has no evidentiary foundation in the record. Indeed, defendant has never claimed that the prosecution knew or should have known of Portillo's immigration status or of any pending deportation issue. Ordinarily, "[t]he prosecution is not required 'to keep "periodic tabs" on every material witness in a criminal case . . . .' [Citation.]" (*People v. Wilson, supra,* 36 Cal.4th at p. 342.)

Second, although the timing and competence of the prosecution's efforts to locate the absent witness within the jurisdiction are important factors in measuring good faith and due diligence (e.g., *People v. Wilson, supra,* 36 Cal.4th at pp. 341–342; *Cromer, supra,* 24 Cal.4th at pp. 903–904), the Court of Appeal failed to give sufficient weight to the information learned by the prosecution during its search efforts, i.e., that Portillo, a foreign national, had been deported eight months before to a country that lacked an agreement with the United States for procuring a witness's attendance at a trial in this state. Thus, even assuming the prosecution should have started its search weeks earlier, further efforts to locate Portillo in California would have been futile and hence were unnecessary. (*Ohio v. Roberts, supra,* 448 U.S. at p. 74 [futile acts not required]; *Smith, supra,* 30 Cal.4th at pp. 610–611; see *People v. Cavazos* (1944) 25 Cal.2d 198, 201 [153 P.2d 177] [when military authorities

---

[12] Wood testified he started his search for Portillo on May 25, 2007, the Friday (before a three-day weekend) when both parties announced they were ready for trial. At that time, the trial was scheduled to begin the following Tuesday, May 29, 2007, although it was trailed one more day.

inform the prosecution that witnesses in the armed forces were outside the court's jurisdiction, "it would have been an idle act to require further inquiry or search in this state"].)[13]

Third, the Court of Appeal's suggestion that Portillo might have returned on his own to California was pure conjecture. Wood's search efforts turned up no indication that Portillo had returned from El Salvador. A check of the law enforcement database, and Wood's discovery that warrants for Portillo remained unexecuted, confirmed that Portillo had not had any contact with authorities.[14] Moreover, a woman living at Portillo's former address did not recognize him, and distribution of wanted flyers in the region resulted in no helpful information. As the dissenting justice below observed, while "deported felons may return to the United States, . . . the facts here do not support this assumption."

Finally, the Court of Appeal did not specify what more the prosecution should have done to obtain Portillo's return to this country had it started its search weeks before the trial date and discovered the fact of his deportation sooner.[15] No matter. It is speculative, in the first instance, to maintain that Portillo would have been found in El Salvador, if only the prosecution had learned earlier of his deportation. The record contains no indication that, given more time, the INTERPOL agents in El Salvador could and would have tried to do more to locate Portillo beyond what they did. Finally, and in any event, even assuming Portillo had been found, there was no international agreement or established procedure for procuring further testimony from the absent Salvadoran resident or for obtaining his presence at defendant's trial.

Relying on *U.S. v. Bourdet* (D.D.C. 2007) 477 F.Supp.2d 164, defendant contends that, had Portillo been located in El Salvador, the prosecution could have secured his presence in the United States outside the terms of any treaty. Even had Portillo been found, defendant's reliance on *Bourdet* is misplaced. In *Bourdet*, the defendants were Guatemalan nationals who were arrested in

---

[13] Our conclusion on this point disposes of defendant's specific contention that good faith and due diligence obligated the prosecution to track down and speak with Portillo's last known attorney, his local KPC gang associates, and his child, mother, and sister living in Santa Ana, California.

[14] Portillo made clear at the June 19, 2006, preliminary hearing that he had been on probation before, that he would go to great lengths to avoid being charged with a probation violation, and that he understood he would be placed on three years of formal probation on a pending felony evading charge if he agreed to testify truthfully at the preliminary hearing. Portillo's own words gave rise to the reasonable inference that he would be highly reluctant to return to the United States to face a likely probation violation charge for failing to report to his probation officer while absent from the United States.

[15] The Court of Appeal does not indicate what date it believed the prosecution's search for Portillo should have started.

El Salvador for alleged drug dealing and then flown to the United States. (*Bourdet*, at pp. 169–170.) Agents of the United States Drug Enforcement Administration had coordinated the arrests with the Salvadoran authorities, but did not direct or otherwise control the arrests. (*Id.* at p. 170.) On appeal, the defendants contended they were brought from El Salvador to the United States in violation of international treaties and United States law. (*Id.* at p. 177.) The United States government conceded that the defendants were not "extradited" from El Salvador, and that their "presence in the United States was acquired outside the terms of the treaty" between the two countries. (*Ibid.*) Despite this concession, *Bourdet* determined the government's method of rendition did not violate the treaty. (*Id.* at p. 178.) Nothing in *Bourdet* has any bearing on the prosecution's obligation of good faith in the confrontation clause context.

### CONCLUSION AND DISPOSITION

For all the foregoing reasons, we conclude the trial court properly admitted Portillo's preliminary hearing testimony at defendant's trial. Based on the undisputed testimony presented to that court, we agree the prosecution satisfied its obligations of good faith and due diligence in demonstrating Portillo's unavailability as a witness, and find the Court of Appeal erred in determining otherwise. The judgment of the Court of Appeal is reversed, and the matter is remanded to that court for further proceedings consistent with our opinion.

George, C. J., Kennard, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**WERDEGAR, J., Concurring.**—As the majority frames the issue, this case requires that we consider what prosecutorial efforts will sustain a finding of unavailability when the absent witness was not in this jurisdiction but in another country. (Maj. opn., *ante*, at p. 623.) The majority concludes that if evidence supports the trial court's finding that the witness was out of the country and in a country with which no treaty exists for the production of witnesses for trials in the United States, the prosecution has "fulfilled its obligation of good faith and due diligence" (*id.* at p. 629) in demonstrating the witness's unavailability; consequently, the trial court properly admitted Portillo's preliminary hearing testimony (*ibid.*; see also *id.* at p. 632). I concur that the trial court properly admitted Portillo's preliminary hearing testimony at defendant's trial. I do so, however, not on grounds the prosecution exercised due diligence, but on grounds of harmless error; as the

majority states, "even assuming the prosecution should have started its search weeks earlier, further efforts to locate Portillo in California would have been futile . . . ." (*Id.* at p. 630.)

The facts of this case are analogous to a situation in which the prosecution is unjustifiably late in beginning its search for a witness, but then discovers the witness died several months earlier. In that situation, even had the prosecution commenced its search in a timely manner, the result would be the same. Hence, any dereliction of the prosecution's duty to exercise due diligence to procure the witness's attendance at trial would be harmless.

The same is true here. Evidence showed Portillo had been deported to El Salvador eight months before trial. The prosecution did not begin looking for him until the last court day before the trial was scheduled to begin. But even had the prosecution begun its search several days or weeks earlier, it would merely have discovered Portillo was out of the country and immune from the court's process. In short, even had the prosecution been reasonably diligent, the result would have been the same.

Although I thus agree with the majority's decision to reverse the Court of Appeal's contrary ruling, I do not join that part of its analysis that concludes the prosecution satisfied its obligation of exercising due diligence in seeking to locate Portillo. As the majority relates, trial was scheduled for March 7, 2007, but was continued two months to May 21 because neither side was ready. On and after May 21 the trial was trailed three times, but by Friday, May 25, it was fairly certain the trial would commence on the next court day, Tuesday, May 29. Only then did investigator Wood begin to search for Portillo. "We have said that the term 'due diligence' is 'incapable of a mechanical definition,' but it 'connotes *persevering application, untiring efforts in good earnest, efforts of a substantial character.*' " (*People v. Cromer* (2001) 24 Cal.4th 889, 904 [103 Cal.Rptr.2d 23, 15 P.3d 243], italics added.) In measuring the prosecution's diligence, the timeliness of the search and the importance of the witness's proffered testimony are important factors. (*Ibid.*)

In my view, the prosecution's belated efforts to locate Portillo—its star witness—do not satisfy this rigorous standard. Rather, in finding good faith and due diligence, the majority seems to be assessing the prosecution's efforts in hindsight; that is, because ultimately the evidence showed any reasonable efforts to locate Portillo would have been futile, the majority concludes the prosecution's efforts, however meager, were sufficient. But harmless error is not due diligence.

In light of the overall importance of the right to confront adverse witnesses, I cannot join the majority's holding that the prosecution's efforts in this case demonstrated good faith and due diligence. But because on the facts of this case the prosecution's lack of diligence was harmless, I concur in the judgment.