Filed 3/19/13  P. v. Smith CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>KWANASIA SMITH,<br><br>　　　　Defendant and Appellant. | A133592<br><br>(San Francisco County<br>Super. Ct. No. 215336) |

## I.  INTRODUCTION

A jury found Kwanasia Smith guilty of second degree robbery.  (Pen. Code, § 211.)  The court sentenced her to three years probation with the condition that she serve one year in either county jail or a drug treatment program.  On appeal, Smith argues that the judgment must be reversed because the trial court (1) violated her constitutional right to confrontation by admitting preliminary hearing testimony from the victim of the robbery; and (2) denied her request for a pinpoint instruction regarding the force element of the robbery charge.  We reject these contentions and affirm the judgment.

## II.  STATEMENT OF FACTS

The incident that gave rise to the charge against Smith occurred near San Francisco's Union Square at around 6:00 p.m. on March 11, 2011.[1]  The victim, Mariko Aida, was a Japanese foreign exchange student who returned to Japan before this case

_____

[1] Unless we state otherwise, all date references are to the 2011 calendar year.

1

went to trial. An edited transcript of Aida's preliminary hearing testimony, which she gave with the assistance of an interpreter, was admitted into evidence at Smith's trial.

Aida testified that she was listening to music on her iPhone when someone grabbed her arm from behind and then reached into her jacket to take her iPhone. Aida turned around and saw her assailant who she identified at the preliminary hearing as Smith. Aida screamed for Smith to stop and tried to pull away but Smith "used her force" and her "tremendous strength" to take the phone away from Aida. Aida testified that she used all her strength to resist but that Smith was very strong and Aida "ended up falling to the ground." Under direct examination, Aida testified that Smith pushed her to the ground. During cross-examination, Aida stated that she lost her balance and fell while she was trying to resist Smith. On redirect, Aida testified that what "caused" her to fall to the ground was "both the fact that I tried to run away from [Smith] as well as [Smith] was trying to take it from me with tremendous force."

Aida testified that, after she fell down, Smith took the phone from her pocket. When asked whether her phone could have fallen out of her pocket when she fell down, Aida responded that was "impossible." Under cross-examination, defense counsel asked Aida whether she remembered telling the police that, after she fell to the ground, the phone fell out of her pocket onto the sidewalk. Aida responded, "It's probably the problem of English. I don't recall saying anything like that."

Two witnesses, David Palmer and Liza Murawski, testified at trial about the physical altercation between Smith and Aida. Both witnesses identified Smith as the aggressor. Palmer described the victim as an Asian girl and Murawski described her as a petite Asian woman. Smith's defense counsel stipulated that the victim was Aida. Murawski testified that Smith initiated the physical struggle by approaching Aida from behind with her arms extended, and that Aida screamed as Smith "fumbled" to steal her phone. When Smith ran away, Murawski went to assist Aida who had fallen to the ground. Several people took off after Smith and tackled her. One of them retrieved the phone, and gave it to Murawski who returned it to Aida. Palmer testified that he saw Smith make contact with Aida by either punching or pushing her, and then Aida fell to

2

the ground and Smith ran away. Palmer and several other people chased after Smith who tossed the phone as she tried but failed to get away.

San Francisco Police Officer Eric Tapang testified at trial that he was called to the crime scene to provide back up. When Tapang arrived at the scene, Aida was "[c]rying, shaken, hysterical." Tapang described Aida as an Asian female in her early 20's, who was approximately five feet tall and weighed maybe 100 pounds and no more than 110 pounds.

A post-arrest interview of Smith was transcribed and admitted into evidence at trial. After Smith waived her *Miranda* rights, she admitted that she took Aida's cell phone. However Smith said that she "didn't have to touch her," and denied that she put her hand in Aida's pocket. Smith said that she just grabbed the cord which was hanging out of Aida's pocket and then ran.

### III. DISCUSSION

**A.     *Aida's Preliminary Hearing Testimony***

Smith contends that the trial court violated her constitutional right to confrontation by admitting Aida's preliminary hearing testimony into evidence at trial.

**1.     *Background***

Aida testified at the preliminary hearing on April 22. On May 6, Assistant District Attorney Victor Hwang asked Aida if she would be willing to testify at Smith's trial in approximately two months. Aida responded that she was in the United States on a student visa, that she would be returning to Japan in the near future, and that she had no interest in testifying in this case. Hwang's notes from that conversation reflect that Aida indicated she was "[n]ot interested or willing to come back for trial." However, Aida agreed that Hwang could give her contact information to an outside agency that could advise her about her rights, give her immigration assistance and advise her about obtaining an alternate visa. After his conversation with Aida, Hwang gave Aida's contact information to a Japanese-speaking immigration paralegal at Asian Pacific Islander Legal Outreach. A few days later, the paralegal reported that Aida said she was not willing to make a return trip for the trial.

On May 10, Hwang sent a subpoena to Aida at her last known United States address, but it was returned with a notice that Aida no longer lived there and that her domestic telephone number was disconnected. On August 16, Hwang attempted to contact Aida by sending an e-mail to the address she previously provided, but the message bounced back as invalid. Hwang also sent a message to Aida through "Facebook," asking if she would return for trial, but she did not respond. On August 17, Hwang arranged for an inspector to find Aida and determine whether she would testify. The investigator reported back that Aida had returned to Japan and that she was not willing to return to the United States for Smith's trial.

On August 31, the People's trial counsel, Assistant District Attorney John Ullom, contacted the Justice Department's Office of International Affairs to inquire about serving a subpoena on a Japanese national in Japan. The representative told Ullom that he believed an invitation could be extended but that a Japanese national on Japanese soil could not be compelled to testify in the United States. The Justice Department representative then arranged a conference with the First Secretary and Legal Attaché at the Japanese Embassy in Washington D.C. The First Secretary told Ullom that it was not possible to compel a Japanese national on Japanese soil to appear at a criminal trial in the United States via a subpoena. An invitation could be extended but appearance could not be compelled and a United States subpoena would not have any force of law in Japan.

On September 1, the trial court conducted an evidentiary hearing to determine whether Aida was an unavailable witness and if her preliminary hearing testimony was admissible at trial. The prosecution's efforts to produce Aida were established by declarations and testimony. In addition, the court received written documentation regarding the Mutual Legal Assistance Treaty (MLAT) between the United States and Japan which confirmed that the MLAT does not provide the state or federal government with subpoena power to compel a Japanese national residing in Japan to appear at a criminal trial in the United States. At the conclusion of the hearing, the trial court found that Aida was unavailable, that the People had exercised due diligence in attempting to

4

locate and produce her as a witness, and that Aida's preliminary hearing testimony was admissible at trial.

## 2. *Legal Principles*

"The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. [Citations.] That right is not absolute, however. An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination." (*People v. Cromer* (2001) 24 Cal.4th 889, 892.)

"A witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial. [Citation.] The United States Supreme Court has described the good faith requirement this way: 'The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness. [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." ' [Citation]" (*People v. Herrera* (2010) 49 Cal.4th 613, 622-623 (*Herrera*).)

California law imposes a similar requirement of "reasonable diligence" to establish witness unavailability. (Evid. Code, § 240; *Herrera, supra*, 49 Cal.4th at p. 622.)[2] "The term '[r]easonable diligence, often called "due diligence" in case law,

---

[2] Evidence Code section 240, subdivision (a)(4) (section 240(a)(4)) states that a witness is unavailable when he or she is "[a]bsent from the hearing and the court is unable to compel his or her attendance by its process." Although this particular subdivision does not contain an express "reasonable diligence" requirement, our supreme court has held that even under section 240(a)(4), "unavailability in the constitutional sense nonetheless requires a determination that the prosecution satisfied its obligation of

" 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " ' [Citation.] Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' [Citations.] In this regard, 'California law and federal constitutional requirements are the same . . . .' [Citation.]" (*Herrera, supra*, 49 Cal.4th at p. 622.)

"[T]o establish unavailability, the prosecution must show that its efforts to locate and produce a witness for trial were reasonable under the circumstances presented. [Citations.] We review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard [citation], and independently review whether the facts demonstrate prosecutorial good faith and due diligence [citation]." (*Herrera, supra,* 49 Cal.4th at p. 623.)

### 3. *Analysis*

Smith contends that the prosecution's "attempts to procure their victim's presence at trial" were insufficient to satisfy the "due diligence" requirement. We disagree. Assistant District Attorney Hwang requested that Aida testify at trial during a telephone conversation shortly after the preliminary hearing. He also attempted to serve a subpoena at Aida's last known address, sent her an e-mail at the address she previously provided and left a message on her Facebook page. Hwang also facilitated contact between Aida and a paralegal from the Asian Pacific Islander Legal Outreach who reported that Aida was not willing to appear and testify at Smith's trial. Finally, Hwang employed an inspector to locate Aida in Japan and request again that she return for the trial. Throughout this process Aida never waivered in her position that she would not return from Japan to testify at Smith's trial. Nevertheless, Assistant District Attorney Ullom explored the possibility of compelling Aida's attendance through conversations with representatives of the United States Justice Department and the Japanese Government.

good faith" in attempting to obtain the presence of the unavailable witness. (*Herrera, supra*, 49 Cal.4th at p. 623.)

Both officials expressly confirmed to Ullom that Aida could not be compelled to return to the United States to testify at Smith's trial.

On appeal, Smith characterizes the prosecution's efforts as "minimal" because there is no evidence that Aida was offered financial assistance to fund a return trip, or given a substantive explanation of the importance of her live testimony at trial. However, evidence of the three direct communications with Aida as well as Hwang's other efforts to communicate with her through e-mail and Facebook support the trial court's express finding that Aida had made an unequivocal decision that she was not willing to return to the United States because she was pursuing her studies in Japan and her cell phone had been returned to her.

Smith also argues that the prosecution's efforts were not sufficient because they failed to issue a formal invitation to Aida pursuant to the MLAT. "[W]hen a criminal trial is at issue, unavailability in the constitutional sense does not invariably turn on the inability of the state court to compel the out-of-state witness's attendance through its own process, but also takes into consideration the existence of agreements or established procedures for securing a witness's presence that depend on the voluntary assistance of another government. [Citation.] Where such options exist, the extent to which the prosecution had the opportunity to utilize them and endeavored to do so is relevant in determining whether the obligations to act in good faith and with due diligence have been met. [Citations.]" (*Herrera, supra*, 49 Cal.4th at p. 628.) The evidence in this record supports the conclusion that the prosecution did make a reasonable effort to utilize the MLAT. As discussed above, the prosecutor explored his options under that treaty and discovered that Aida could not be compelled to return. Further, although an invitation could be issued, by that point in the proceeding, Aida had made clear three different times that she was not willing to return to the United States voluntarily. These circumstances support the trial court's finding that issuing an invitation under the MLAT would have been a futile act.

Finally, we find that any error regarding the admission of this preliminary hearing testimony was harmless. The parties agree that the harmless beyond a reasonable doubt

7

test applies. (See *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684.) Smith's theory is that Aida's "contradictory" preliminary hearing testimony was the only evidence supporting the force element of the theft charge and, therefore, Aida's physical presence at trial was essential to a fair resolution of this issue by the jury.

Robbery is defined as the "taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Pen. Code, § 211.) "Where the element of force or fear is absent, a taking from the person is only theft; although by virtue of Penal Code section 487 it constitutes grand theft regardless of the value of the property." (*People v. Morales* (1975) 49 Cal.App.3d 134, 139 (*Morales*).)

In the present case, Aida's testimony was not the only evidence that Smith took Aida's phone by force or fear.[3] Smith admitted to police that she took the phone from Aida. Two eyewitnesses testified at trial that they observed Smith exert physical force on Aida. That testimony, along with the descriptions of Aida's reactions to Smith's use of force that were provided by the witnesses and the police officer who responded to the crime scene, constitute substantial evidence that the phone was taken by force or fear.

Furthermore, Aida's testimony was not contradictory. According to Smith, Aida contradicted herself by initially claiming that Smith pushed her down but then admitting during cross-examination that she slipped and fell trying to run away from Smith. Smith overlooks that Aida also testified that she had some trouble communicating in English and that she explained on redirect that she fell while trying to get away from Smith who was using "tremendous force" to try to take the phone from her.

Indeed, by attempting to manufacture conflicts in Aida's preliminary hearing testimony, Smith confirms that her trial counsel had a full and fair opportunity to cross-

---

[3] Smith contends that the "taking in this case was by force not fear." However, " 'force' is not an element of robbery independent of 'fear'; there is an equivalency between the two. ' "[T]he coercive effect of fear induced by threats . . . is in itself a form of force, so that either factor may normally be considered as attended by the other." ' [Citation.]" (*People v. Wright* (1996) 52 Cal.App.4th 203, 211.)

examine Aida at the preliminary hearing. In the end, this was not a close case; the elements of the robbery charge were established by strong evidence. Although Aida's testimony was important, it was corroborated by other evidence at trial. Under all these circumstances, any error regarding the admission of the preliminary hearing testimony was harmless beyond a reasonable doubt.

**B.     *The Pinpoint Instruction***

**1.     *Background***

The jury was instructed on the elements of robbery with CALCRIM No. 1600, which states:  "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant took property that was not her own; [¶] 2. The property was taken from another person's possession and immediate presence; [¶] 3. The property was taken against that person's will;  [¶] 4. The defendant used force or fear to take the property or to prevent the person from resisting; AND [¶] 5. When the defendant used force or fear to take the property, she intended to deprive the owner of it permanently." [¶] The defendant's intent to take the property must have been formed before or during the time she used force or fear. If the defendant did not form this required intent until after using the force or fear, then she did not commit robbery. [¶] A person takes something when he or she gains possession of it and moves it some distance. The distance moved may be short.  [¶] The property taken can be of any value, however slight. [¶] Fear, as used here, means fear of injury to the person himself or herself. [¶] Property is within a person's immediate presence if it is sufficiently within his or her physical control that he or she could keep possession of it if not prevented by force or fear. [¶] An act is done against a person's will if that person does not consent to the act. In order to consent, a person must act freely and voluntarily and know the nature of the act."

Before the jury was instructed, Smith's trial counsel argued that CALCRIM No. 1600 would not provide the jury with sufficient "guidance on what force is necessary to constitute a robbery rather than a grand theft, or larceny by theft . . . ."  Thus, Smith requested that the court modify the instruction.  Smith's proffered version of CALCRIM

9

No. 1600 italicized some of the standard language in the instruction and also added the following statement:  "The force required for robbery must be more than just that quantum of force which is necessary to accomplish the mere seizing of the property."

We do not have a complete record of the discussion between the court and counsel regarding this proposed modification.  However, the record does reflect that the trial court was reluctant to modify the model language in the CALCRIM instruction, and that it advised counsel that any supplemental pinpoint instruction would need to be a complete and accurate statement of the law.  The court also asked counsel to confer about the matter and Smith's trial counsel agreed to discuss the matter with the prosecutor.

In the end, the jury received the standard CALCRIM instruction we have quoted above *and* a special pinpoint instruction regarding the force element of the robbery charge which stated:  "The force required for robbery must be more than the incidental touching necessary to take the property.  For purposes of the crime of robbery, the degree of force is immaterial."

### 2.    *Analysis*

Smith contends that she was entitled to have the jury receive her proposed pinpoint instruction because it addressed the primary legal issue in this case, i.e., the distinction between the force that constitutes a theft from a person and the force required for a robbery.

"A defendant is entitled to a pinpoint instruction, upon request, only when appropriate.  [Citation.]  'Such instructions relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi.  [Citation.]' "  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.)  However, even when requested, the "trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation]."  (*People v. Bolden* (2002) 29 Cal.4th 515, 558.)  Furthermore, the trial court "may modify any proposed instruction so long as the modifications are themselves correct and pertinent to the issues.  [Citations.]"  (*People v. Dieguez*  (2001) 89 Cal.App.4th 266, 277.)

10

On this record, it is not clear that Smith actually objected to the pinpoint instruction that the trial court gave. Indeed, Smith may have agreed to or even proposed some or part of that language. What is clear is that the language Smith initially proposed is duplicative of the pinpoint instruction that the jury received. Thus, the trial court did not err by rejecting Smith's proposed instruction since it addressed precisely the same issue covered by the pinpoint instruction that the trial court gave.

In her opening brief on appeal, Smith contends that the pinpoint instruction that the trial court used was inappropriate because it was narrowly tailored to address a pickpocket case whereas her proposed instruction was a "more general and an appropriate statement of the law that would have guided the jury on distinguishing a robbery from a theft based upon the amount of force used . . . ." To support this theory, Smith relies on *People v. Garcia* (1996) 45 Cal.App.4th 1242 (*Garcia*).[4]

In *Garcia*, the defendant was convicted of second degree robbery based on evidence that he entered a market, approached a cashier who was standing in front of an open cash register, and "lightly pushed his left shoulder against the cashier's right shoulder, 'like a tap.' " (*Garcia, supra*, 45 Cal.App.4th at p. 1244.) The cashier felt the push or tap on her shoulder and moved away from the register because she was afraid the defendant might be armed. The defendant then took money from the register and escaped. (*Id*. at p. 1245.) On appeal, the *Garcia* defendant argued the trial court erred by failing to sua sponte instruct the jury on the lesser offense of theft. (*Ibid*.) The defendant's theory was that the jury could have found that his tap on the cashier's shoulder was not sufficient force to constitute a robbery. He reasoned that "the force required for robbery is more than an incidental touching. A pickpocket touches the victim in extracting a wallet from his pocket, but this does not make the pickpocket a robber." (*Id*. at p. 1246.)

---

[4] *Garcia* was disapproved on other ground in *People v. Mosby* (2004) 33 Cal.4th 353, 365.

11

The *Garcia* court rejected the defendant's theory for the following reason: "The force required for robbery is more than 'just the quantum of force which is necessary to accomplish the mere seizing of the property.' [Citation.] In the present case, however, the touching was more than incidental and was not merely the force necessary to seize the money. The defendant did not simply brush against the cashier as he grabbed for the money. He intentionally pushed against her to move her out of the way so he could reach into the register." (*Garcia, supra,* 45 Cal.App.4th at p. 1246.) Thus, the court concluded that "pushing the cashier went beyond the 'quantum of force which [was] necessary' to grab the money out of the cash register." (*Ibid.*) The court also found that, although the tap may have been a rather "polite" use of force, "for purposes of the crime of robbery, the degree of force is immaterial. [Citation.]" (*Ibid.*)

In her opening brief, Smith mischaracterizes *Garcia, supra,* 45 Cal.App.4th 1242*,* as a pickpocket case. Although she admits her error in her reply brief, Smith reiterates that she was entitled to a jury instruction regarding the "quantum of force" necessary to accomplish a robbery as opposed to a theft. However, *Garcia* illustrates that there is no substantive distinction between that concept and the "incidental touching" language used in the pinpoint instruction that the jury received. *Garcia* also establishes that the trial court's pinpoint instruction was a more complete and therefore more accurate statement of the law than Smith's proposed language, because the court's instruction also told the jury that, although it needed to find that the type of force used was something other than incidental touching, the "degree of force" was immaterial. (*Garcia, supra*, 45 Cal.App.4th 1246.)

Smith also relies on *People v. Church* (1897) 116 Cal. 300 (*Church*) and *Morales*, *supra,* 49 Cal.App.3d at page 139. These cases address the trial court's sua sponte duty to instruct on the lesser included offense of theft, an issue not relevant to this appeal because the jury in this case was instructed on that lesser charge. Beyond that, *Church*, *supra,* 116 Cal. 300, does not use the "quantum of proof" language that Smith prefers. Apparently, *Morales, supra*, 49 Cal.App.3d at page 139, is the source of that language. However, we find nothing in that case to support Smith's contention that this language

means anything different than that the "force required for robbery must be more than the incidental touching necessary to take the property." Since the court's pinpoint instruction covered that issue, Smith's proposed language was redundant and the court was not required to give it.

## IV. DISPOSITION

The judgment is affirmed.

_____
Haerle, J.

We concur:

_____
Kline, P.J.

_____
Richman, J.