Filed 7/15/14  P. v. Park CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B251124 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA124148) |
| v. | |
| JIN WOO PARK, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Raul Anthony Sahagun, Judge.  Affirmed.

Law Office of Herb Fox and Herb Fox for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez, Rene Judkiewicz and Garrett Gorlitsky, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted appellant Jin Woo Park of torture (Pen. Code, § 206; count 1),[1] corporal injury to spouse/cohabitant/child's parent (§ 273.5, subd. (a); count 2), and false imprisonment by violence (§ 236; count 3). The jury also found true the allegations in counts 2 and 3 that appellant personally inflicted great bodily injury upon the victim under circumstances involving domestic violence (§ 12022.7, subd. (e)). Appellant was sentenced to life in prison with the possibility of parole on count 1, nine years in state prison on count 2 (comprised of the upper term of four years plus a five-year enhancement), and eight years in state prison on count 3 (comprised of the upper term of three years plus a five-year enhancement). The sentences on counts 2 and 3 were stayed under section 654.

Appellant's sole contention on appeal is that he was deprived of his constitutional and statutory rights of confrontation because the prosecution failed to make a reasonably diligent effort to procure the percipient witness—appellant's minor son—for trial.

## FACTS

### The Crimes

On Sunday, March 4, 2012, appellant, his wife Eun, and their 12-year-old son Harold, were inside their two-story home in Cerritos, California.[2] Appellant called Harold downstairs, and Harold saw his father yelling at his mother. He also saw that Eun's face was swollen.[3] Appellant told Harold to ask his mother about some money, and Harold then returned to his bedroom. Harold later went into the bathroom in his parents' master bedroom, where he saw his mother kneeling in a corner and two large holes in a bloodied wall. Her face was more swollen than before. Harold saw appellant kick Eun in the head. Harold went downstairs and then saw appellant get some tape and a towel from a downstairs closet. When Harold went back to his parents' bedroom, he

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     For ease of reference, we refer to the victim and her son by their first names.

[3]     The information about what Harold saw is taken from the transcript of his preliminary hearing testimony, which the trial court allowed over defense objection.

saw Eun on her bed. Her arms, legs, wrists and eyes were tied up with tape. Appellant asked Harold to hold his mother down while he went to get some more items. After appellant came back to the room, Harold went to his own bedroom and went to sleep.

**The Investigating Officers' Testimony**

The next day appellant took Harold to school, and Harold told his counselor what he had seen. The incident was reported, and Los Angeles County Deputy Sheriff Maria Cordova and her partner Deputy Frank Cordova responded to the school in the afternoon. At the school, Deputy Maria Cordova met with Harold. When appellant arrived to pick up Harold from school, appellant told Deputy Maria Cordova that his wife was at home and that she was okay.

Meanwhile, Deputy Frank Cordova went to appellant's house to check on Eun. Inside the house, he heard a faint female voice moaning and groaning and calling for help. He found Eun wearing only underwear and in a fetal position in a corner of the master bedroom. Deputy Frank Cordova called for paramedics, and Deputy Maria Cordova arrested appellant at the school.

Deputy Maria Cordova later went to UCI Medical Center where she saw the severity of Eun's injuries. Her head was very swollen, her eyes were swollen shut with blood coming out and down from the sides, her ears were bleeding, her whole body was bruised, she was wearing a neck brace, and parts of her body were red.

Sheriff's Detective Michael Gaitan also went to appellant's house on March 5, 2012. In a wall of the master bathroom, he saw an oval-shaped hole the size of a head. There were red marks that appeared to be blood. And there was black tape in the bathroom trash can. After photographing the crime scene, Detective Gaitan went to UCI Medical Center. He saw that Eun had a brace on her neck. Her face was extremely swollen, she could not open her eyelids, she had dried blood in and around her eyes and ears, and she had numerous bruises.

On the same day, March 5, 2012, native Korean speaker Jasen Na, a reserve deputy with the Los Angeles County Sheriff's Department, spoke to appellant at the sheriff's station. Appellant told Deputy Na that he had financial problems, that he gave

his whole salary to his wife and discovered half or more of his monthly salary withdrawn from his checking balance, and that he was arguing with his wife about money and her having affairs and a boyfriend. Deputy Na testified that appellant "said he did not admitted [sic] to the detective he was beating his wife because that statement . . . would, you know, [be] worse for him." On redirect examination, Deputy Na was asked, "did [appellant] tell you 'I didn't tell the detective that I beat my wife because I knew it would hurt my case'?" Deputy Na answered, "Exactly, ma'am."

**The Medical Evidence**

Emergency room physician Karin Reed observed the significant swelling of Eun's head and that her eyes were swollen shut. Dr. Reed observed that Eun appeared to be a frightened, very petite woman, only about five feet tall and maybe 100 pounds. Dr. Reed saw that Eun had bruises in different stages of development and repair, indicating that she had received the bruises over a period of time. The red color of Eun's arms tended to indicate she was injured due to squeezing. The bruising and redness on her neck and chest were consistent with a strangulation injury. Eun had fractures on the right orbit surrounding her eye and on her nose, which could be consistent with blunt force trauma.

## DISCUSSION

Appellant contends that he was deprived of his constitutional and statutory rights to confront the only witness to the events at his house because the victim did not testify. Specifically, he argues that the trial court improperly allowed the prosecution to read to the jury Harold's preliminary hearing testimony, when the prosecution failed to exercise due diligence in securing Harold's live attendance at trial. We disagree.

### A. *Procedural Background*

Harold testified at his father's preliminary hearing on June 29, 2012. In September 2012, Harold moved with his mother to South Korea, where he was under the legal guardianship of his maternal aunt, Ji Y., after the Department of Children and Family Services (DCFS) terminated its jurisdiction over him. Prior to appellant's trial in February 2013, defense counsel objected to the prosecutor presenting Harold's preliminary hearing testimony.

4

The trial court held a hearing on the admissibility of the preliminary hearing transcript. The prosecutor argued that Harold was unavailable as a witness at trial because he was a minor living in South Korea. The prosecutor showed the trial court e-mail communications between her and Ji Y.,[4] as well as e-mails from the DCFS social worker handling Harold's case, confirming that Harold "has been released and custody has been terminated." The prosecutor argued that it would be futile to make further attempts to procure Harold's presence in court.

Defense counsel argued that the prosecutor could have asked for an earlier trial date to assure Harold was still in California. He further argued that after the preliminary hearing, the prosecution was forewarned that Harold was going back to South Korea, and that the prosecutor had three-and-a-half months to take action to compel Harold to come to trial, recognizing that "it's unfair for me to say she didn't do any [thing] because a prior lawyer . . . had this case and . . . he dropped the ball."

The prosecutor explained that the three-and-a-half-month period was when the People were pushing for the preliminary hearing because DCFS had alerted the prosecution that it intended to send Harold to South Korea. The prosecutor argued that instead of "sitting around doing nothing," . . . "[w]e were pushing this case to go to preliminary hearing so that we could memorialize Harold's testimony in a setting like this where he would be cross-examined. . . . Once D.C.F.S. decides to terminate custody, what are the People supposed to do? Take Harold and put him in juvenile hall? Serve him with a subpoena? That's not going to stop him from going to Korea. His maternal aunt who we have no jurisdiction over, she's not involved in this case, took custody of

---

[4]    On September 29, 2012, the prosecutor sent an e-mail to Harold's aunt, stating in part: "The case got continued for a month due to the poor health of the defense attorney. We may not be able to settle this case and I need to prepare for the responsibility of going to trial and having mom and Harold brought to Los Angeles for testimony." On October 11, 2012, Harold's aunt replied by e-mail that his mother was still unwell and "so looks difficult to go to L.A. for court in my opinion." On February 6, 2013, the prosecutor sent Harold's aunt another e-mail informing her that the case was proceeding to trial, and offering to fly Harold and his mother to Los Angeles to testify. There was no response to this e-mail.

him and took him to Korea.  We do not have jurisdiction over his maternal aunt, and Harold is a minor in Korea.  The fact that counsel's indicating that we should have pushed this to trial when we were trying to push this to preliminary hearing before Harold left, there are probably three occasions when co-counsel to [defense counsel] came in and represented that he had health problems."

The prosecutor subsequently called the DCFS social worker assigned to Harold's case, Jennifer Higuchi (Higuchi), who testified that DCFS took jurisdiction over Harold in the spring of 2012.  Harold was placed in a foster home because DCFS could not find any local family members.  On June 19, 2012, Higuchi advised the prosecutor that DCFS was planning to terminate custody over Harold in September 2012, because the best caregiver for Harold at that time was his maternal aunt in South Korea.  Higuchi testified that DCFS "had no choice but to terminate the case" because of Ji Y.'s residence in South Korea.  Ji Y. came to the United States to take custody of Harold in September 2012, and took him to South Korea, where he was living with her.

Following Higuchi's testimony, defense counsel argued that Harold could have been served with a subpoena up until September 2012.  The trial court responded, "You keep saying served with a subpoena but there wasn't even a trial date set.  They were trying to get the preliminary hearing on the road so he hadn't even been arraigned in superior court."  The trial court found that the prosecution exercised reasonable diligence in trying to secure Harold's presence, and that Harold was beyond the court's scope and authority.

### B.  Applicable Law

The confrontation clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.)  This clause is made applicable to the states through the Fourteenth Amendment.  (*Pointer v. Texas* (1965) 380 U.S. 400, 403.)  The purpose of the confrontation clause is to test the reliability of evidence through cross-examination. (*Davis v. Alaska* (1974) 415 U.S. 308, 315–316.)

6

The right to confront and cross-examine witnesses "is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295.) An exception to the right to confront and cross-examine a witness at trial is where, as here, a witness is unavailable and has given testimony at a prior court proceeding against the same defendant and was subject to cross-examination. (*Barber v. Page* (1968) 390 U.S. 719, 722; *People v. Cromer* (2001) 24 Cal.4th 889, 897.)

"California allows introduction of the witness's prior recorded testimony if the prosecution has used 'reasonable diligence' (often referred to as due diligence) in its unsuccessful efforts to locate the missing witness." (*People v. Cromer*, *supra*, 24 Cal.4th at p. 892, citing Evid. Code, § 240, subd. (a)(5).) "Unavailability may . . . be shown by evidence that the witness . . . has removed to a location beyond the reach of the court's process. [Citation.]" (*People v. Cromer, supra,* at p. 897, fn. 2.)

Thus, Evidence Code section 1291, subdivision (a) carves out an exception to the hearsay rule for evidence of a declarant's former testimony "if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the . . . proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

A witness is unavailable to testify if the court cannot compel the witness's attendance by its process, or the witness is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subds. (a)(4) & (5).)

"The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists . . . , 'good faith' demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation. 'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.' [Citations.] The ultimate question is whether the witness is unavailable despite good-

7

faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate." (*Ohio v. Roberts* (1980) 448 U.S. 56, 74–75.)

Whether the trial court properly ruled on the unavailable witness's former testimony is subject to a mixed standard of review. First, the appellate court must examine the trial court's resolution of disputed factual issues under the deferential substantial evidence standard of review, and then must independently review whether the facts show prosecutorial good faith and due diligence. (*People v. Herrera* (2010) 49 Cal.4th 613, 623.)

### C. Analysis

To support his claim that the prosecutor did not exercise reasonable or due diligence in securing Harold's live testimony at trial, appellant merely lists several steps the prosecutor failed to take. Appellant is unpersuasive.

First, appellant complains that the prosecutor failed to serve a subpoena on either Harold, his attorney or his temporary guardian while Harold was still in this country, even though the prosecutor was in communication with these individuals prior to the preliminary hearing. But as the trial court noted, no trial date had been set before Harold was taken to South Korea by his aunt. Moreover, the prosecutor explained that during the time Harold was still here, the People were pushing to have the preliminary hearing held so that Harold could testify and be cross-examined by the defense, which is exactly what happened.

Second, appellant complains that after Harold left this country the prosecutor failed to obtain a subpoena from a federal court pursuant to title 28 United States Code section 1783. This federal long-arm statute provides in part: "A court of the United States may order the issuance of a subpoena requiring the appearance as a witness before it . . . of a national or resident of the United States who is in a foreign country, . . . if the court finds that particular testimony . . . is necessary in the interest of justice. . . ." (28 U.S.C. § 1783(a).) Here, Harold had already testified at the preliminary hearing and

8

was cross-examined by the defense at that hearing. Thus, a finding that his trial testimony was "necessary in the interest of justice" was unnecessary.

Third, appellant complains that the prosecutor made no effort to secure Harold's attendance at trial by invoking the provisions of a treaty between the United States and South Korea. The "Treaty Between the United States of America and the Republic of Korea on Mutual Legal Assistance in Criminal Matters" (treaty) provides that both countries "shall provide mutual assistance" in criminal matters, including "transferring persons in custody for testimony" and "any other form of assistance not prohibited by the laws of the Requested State." On the subject of testimony, the treaty provides: "The Requested State *shall invite* a person in that State to appear before the appropriate authority in the Requesting State. The Requesting State shall indicate the extent to which the expenses will be paid. The Central Authority of the Requested State shall promptly inform the Central Authority of the Requesting State of the person's response." (Italics added.) Appellant points to no place in the treaty providing a compulsory mechanism to force residents in South Korea to travel to the United States to testify. Indeed, defense counsel acknowledged to the trial court the "voluntary" nature of the cooperation by the government of South Korea.

In raising these alleged "failures" by the prosecutor, appellant disregards a critical fact: Harold is a minor. It is undisputed that DCFS terminated its jurisdiction over Harold in September 2012, when his maternal aunt took him to live with her in South Korea and became his legal guardian. As a minor, Harold did not have control over where he lived and where he could travel.

In sum, the evidence shows that while Harold was still in this country, the prosecutor acted diligently in trying to move the case along, which had not even reached the preliminary hearing stage by the time DCFS indicated that it was going to terminate its jurisdiction over Harold. But the prosecutor was able to secure Harold's testimony at the preliminary hearing, where he was cross-examined by the defense, who later requested trial continuances. After Harold left this country, the trial court no longer had jurisdiction over him and never had jurisdiction over his aunt. The steps appellant

9

suggests that the prosecution should have taken (serving a subpoena on a minor in South Korea or relying on the voluntary cooperation provisions of an international treaty) would have been a futile attempt to bring a 12-year-old boy back to this country to testify once again about his father's vicious torture and abuse of his mother.

We conclude that the trial court did not violate appellant's rights in allowing the prosecution to read Harold's preliminary hearing testimony to the jury.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
             ASHMANN-GERST


We concur:


_____, P. J.
      BOREN


_____, J.
      CHAVEZ

10