Filed 3/4/15  P. v. Amos CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B252013 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA101216) |
| v. | |
| ANGELA LENETTA AMOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Bruce F. Marrs, Judge.  Affirmed.

Dawn Schock, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Angela Lenetta Amos (defendant) appeals from her conviction of attempted voluntary manslaughter and assault with a deadly weapon. She contends that the trial court erroneously admitted the victim's prior testimony in violation of her constitutional right of confrontation. Finding no merit to defendant's contention and no prejudice, we affirm the judgment.

## BACKGROUND

**Procedural history**

Defendant was charged with assault with a deadly weapon, in violation of Penal Code section 245, subdivision (a)(1),[1] and the attempted willful, deliberate, and premeditated murder of Lamar Mays (Mays) in violation of sections 187, subdivision (a), and 664, subdivision (a). It was alleged in both counts that defendant personally inflicted great bodily injury upon the victim within the meaning of section 12022.7, subdivision (a), and that she personally used a deadly and dangerous weapon (a knife), within the meaning of section 12022, subdivision (b)(1). It was also alleged that defendant had suffered two prior prison terms within the meaning of section 667.5, subdivision (b), and four prior felonies within the meaning of section 1203, subdivision (e)(4).

A jury convicted defendant of assault with a deadly weapon as charged in count 1, and as to count 2, found defendant guilty of the lesser included offense of attempted voluntary manslaughter (§§ 664/192, subd. (a)). The jury also found true the allegations that defendant personally used a deadly weapon and inflicted great bodily injury. In a bifurcated proceeding, the trial court found true the two prior prison term allegations.

The trial court sentenced defendant to 10 years six months in prison, comprised of the upper term in count 2 of five years six months, plus three years for the infliction of great bodily injury, one year for the personal use of a deadly weapon, and one year for one prior prison term. As to count 1, the trial court sentenced defendant to the middle term of three years, plus the three-year great bodily injury enhancement and one year for the weapon, all stayed pursuant to section 654. Defendant was ordered to pay mandatory

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

fines and fees, and was given 225 days of presentence custody credit. The court also found defendant in violation of probation on another case (L.A. Superior Court case No. KA101129), and sentenced her to a total concurrent term of four years six months.

Defendant filed a timely notice of appeal from the judgment.

**Evidence presented**

Enrique Marron (Marron) testified that he was the manager of Tacos Omana restaurant and was working at 2:00 p.m. on March 13, 2013, when he heard angry shouting outside the restaurant. He went outside to check and saw a woman and a man arguing. Though Marron did not know them, he had often seen them both in the neighborhood. Marron identified defendant as the woman who was shouting, and later the man was identified as Mays. Mays appeared to be under the influence of drugs and was only semi-conscious. Marron saw defendant make stabbing motions at Mays, who protected himself by blocking the blows with his leather jacket. Mays did not punch or grab defendant. Finally after about 10 to 15 stabbing motions, the torn jacket fell to the ground and defendant stabbed Mays in the chest. Mays then pushed defendant and left the area. Defendant threw the knife toward the parking lot and waited for the police to arrive. Marron did not see Mays touch defendant in any way other than pushing her just before he walked away.

Pomona Police Officer Paul Fernandez saw defendant near Tacos Omana's. After transporting her to the police station Officer Fernandez participated in defendant's booking. He saw no visible injuries on defendant, and the female jailer who searched her did not report any injuries.

Officer Travis Johnson testified that he found Mays lying on the ground about a block from the taco stand at approximately 2:22 p.m. Mays was holding his upper chest, bleeding, and having trouble breathing. At first, out of fear, Mays refused to give the officer information and told him to ask the people at Omana's. Then Mays said his assailant had become angry because he would not marry her, and she had a silver knife which she had thrown near the trash can afterward. Officers Fernandez and Gibson brought defendant for a field show-up as Mays was being loaded into the ambulance.

3

Mays identified defendant as his assailant. A knife with fresh blood on its five-inch blade was soon found near the taco stand by another officer.

Mays did not appear at trial and his preliminary hearing testimony was read to the jury. Mays testified that that he ended his relationship with defendant the previous Valentine's Day because he had married a woman he had met in a Bakersfield rehabilitation facility in 2012. He added that on March 13, 2013, he was intoxicated and had used heroin. Mays testified that he was at Omana's restaurant when he suffered a stab wound to the chest, resulting in a punctured lung. He claimed that defendant was angry because of his marriage and because she was drunk. Defendant shouted at him, he backed away from her as she came toward him, there was a big commotion, and then he woke up with a hole in his chest. At first, Mays denied knowing who had stabbed him and claimed that he did not remember speaking to the police. He then testified that defendant had a silver knife which she swung at him several times. He told her to stop, held his jacket in front of himself in defense, and backed away. He claimed never to have touched or threatened defendant.

Physician Karan Manchandia treated Mays at County/USC Medical Center on March 13, 2013, for a life-threatening stab wound to his left chest which lacerated a lung and caused air and blood to enter the chest cavity. Dr. Manchandia testified that Mays was treated for several days with a chest tube to suction out the air while his lung healed. Opiates were found in Mays's hospital blood screen.

Unida Vaughn (Vaughn) testified that she married Mays in December 2012 in Bakersfield, and that they were presently separated. Vaughn became aware that Mays had a girlfriend when a woman telephoned her the day Mays was injured. The caller asked who Vaughn was and how she knew Mays. When Vaughn told the woman that Mays was her husband, the woman replied that she was also with him, but had not known about Vaughn or their relationship. The woman seemed angry and told Vaughn that Mays was in Pomona and if she could not have him, Vaughn would get him back in a body bag. The woman told Vaughn that she was going to find Mays and stab him.

Detective Anthony Luna obtained defendant's telephone records for March 13, 2013, and determined she made several calls to Vaughn and Mays on that day.

## DISCUSSION

Defendant contends that the trial court erred in finding that the prosecutor used due diligence in attempting to locate Mays for trial and in admitting his preliminary hearing testimony.

A defendant's constitutional right of confrontation is not absolute, but subject to an exception which permits the admission of the prior testimony of an unavailable witness. (*People v. Herrera* (2010) 49 Cal.4th 613, 621 (*Herrera*), citing *Chambers v. Mississippi* (1973) 410 U.S. 284, 295, and *People v. Cromer* (2001) 24 Cal.4th 889, 897 (*Cromer*).) This traditional exception is codified in Evidence Code section 1291, subdivision (a)(2), which "provides that 'former testimony,' such as preliminary hearing testimony, is not made inadmissible by the hearsay rule if 'the declarant is unavailable as a witness,' and '[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.' Thus, when the requirements of section 1291 are met, the admission of former testimony in evidence does not violate a defendant's constitutional right of confrontation. [Citation.]" (*Herrera*, *supra*, at p. 621, fn. omitted.)

Before the exception can be applied, the prosecution must demonstrate the unavailability of the witness and that a good faith effort was made to obtain the witness's presence at trial. (*Ohio v. Roberts* (1980) 448 U.S. 56, 65; *Cromer*, *supra*, 24 Cal.4th at p. 897.) An absent witness is unavailable if the prosecution shows that it "has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5); *Cromer*, at p. 897.) Reasonable "diligence has been found when the prosecution's efforts are timely, reasonably extensive and carried out over a reasonable period. [Citations.]" (*People v. Bunyard* (2009) 45 Cal.4th 836, 856.) In contrast, diligence is lacking where the prosecution's efforts are "perfunctory or obviously negligent. [Citations.]" (*Id*. at p. 855.)

5

We review de novo the trial court's determination of diligence, considering "'the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' [Citations.]" (*Herrera*, *supra*, 49 Cal.4th at p. 622.) To the extent the evidence is disputed, "the trial court's resolution of disputed factual issues, often by determining the credibility of witnesses, is reviewed deferentially on appeal under the substantial evidence standard." (*Cromer*, *supra*, 24 Cal.4th at p. 902.)

On the first day of trial, the prosecutor reported to the trial court that Mays had not been located and he wished to present Mays's preliminary hearing testimony. Mays had been in custody at the time of the preliminary hearing due to his failure to appear despite having been served with a subpoena. On July 9, 2013, the date the matter was first called for trial, Mays again failed to appear despite having been served with a valid subpoena. The trial court issued a body attachment. Trial was continued until August 12, 2013, and then August 22, 2013, but Mays was not located in the meantime.

The trial court held an Evidence Code section 402 hearing prior to jury selection. To establish diligence in attempting to locate Mays, the prosecution called District Attorney Investigator, Pete Radovic (Radovic) who testified that he began searching for Mays on June 5, 2013, more than one month prior to the first trial date in July 2013. One of Mays's ex-wives told Radovic that Mays was then living with his current wife in Bakersfield, so Radovic contacted the Kern County District Attorney's office for assistance. One of the Kern County investigators was able to serve Mays with the subpoena at a Bakersfield park where Mays had been living.

Beginning on July 29, 2013, two weeks prior to the first continued trial date, Radovic again attempted to find Mays. Since Mays had an outstanding warrant from a Pomona court in another case, Radovic spoke to his contacts in the Bakersfield Police Department and the Kern County District Attorney's office, and made them aware of the warrant. A district attorney investigator contacted Mays's wife, who was also trying to locate him so that she could serve him with divorce papers. Radovic checked with the coroner's office twice, including the day of the hearing, but Mays was not in its system.

6

He also checked the four major hospitals and a major rehabilitation center in Bakersfield, with no success. Radovic contacted Bakersfield's main entry detention center, but Mays was not in custody. Radovic also ran an unsuccessful search in a database of other places where Mays might have been in custody, and that inquiry remained in the system at the time of trial.

Detective Luna testified that he attempted to find Mays in Pomona. He had a telephone number for Mays, but Mays had lost his cell phone. Detective Luna searched the "Holt corridor," an area of the 900 and 1000 blocks of West Holt Avenue, near Tacos Omana restaurant where Mays was known to frequent. Detective Luna had previously been able to serve Mays with a subpoena outside a liquor store in that neighborhood. The detective went there once a week, but did not find Mays. He also alerted police officers who worked in that area to keep an eye out for Mays. He also spoke to the detective who had taken Mays into custody prior to the preliminary hearing. Detective Luna checked the only other place in Pomona where Mays was known to frequent, a large house divided into several apartments, north of Holt Avenue.

The defense called Jamela Drew (Drew) who testified that she knew Mays by sight and saw him on Saturday, August 17, 2013, walking on Hamilton Boulevard near Holt Avenue in Pomona between 7:30 and 8:00 a.m.

The trial court found that the People had demonstrated due diligence and ruled that Mays's preliminary hearing testimony would be admitted. Defendant contends that beginning the search for Mays on July 29, 2013, was unreasonable, considering Mays's history of uncooperativeness, substance abuse, and homelessness. He argues that searching for Mays only in Kern County and "a narrow corridor of Pomona" was perfunctory, as demonstrated by Drew's sighting of him a few days before trial. Defendant argues that Detective Luna should have checked hospitals, rehabilitation centers, and electronic databases for other Los Angeles County facilities.

Defendant neglects to mention that although Detective Luna searched the Holt corridor just once per week, officers patrolling the Holt corridor were asked to watch for Mays. And contrary to defendant's reasoning, Drew's sighting of Mays demonstrated

7

that Detective Luna and the patrol officers were conducting their search in the right place to find Mays. The fact that the prosecution could have done more does not mean that its efforts were unreasonable. (*People v. Valencia* (2008) 43 Cal.4th 268, 293.) That is particularly so in this case, as Drew's sighting of Mays so close to the time of trial supports the theory that he was indeed in the area he was known to frequent, and a search of Los Angeles County hospitals, rehabilitation centers, and electronic databases, would probably have been unsuccessful.

We do not conclude that the efforts to locate Mays were untimely. Investigator Radovic began his search in early June and successfully arranged to have Mays served with a trial subpoena. When the trial was continued, Radovic resumed his search two weeks prior to trial. As Mays was apparently a transient, it is unlikely that beginning earlier in July would have proven successful.

Finally, as respondent notes, Mays's testimony was not so "'critical'" or "'vital'" to the prosecution's case, such that greater efforts would be required. (*People v. Hovey* (1988) 44 Cal.3d 543, 564.) The testimony of Marron, Vaughn, Officer Johnson, Detective Luna, and Dr. Manchandia were sufficient to permit the jury to find defendant guilty beyond a reasonable doubt. Eyewitness Marron testified that defendant was the aggressor, and Mays, who appeared to be under the influence of some substance and was almost unconscious throughout the incident, never touched defendant until after he was stabbed, when he pushed her and walked away. Marron witnessed defendant strike at Mays numerous times with a knife and finally stab him in the chest. A woman calling from the telephone number identified by Detective Luna as belonging to defendant, told Vaughn earlier in the day that she intended to stab Mays. Mays identified defendant as his attacker while being treated on the scene by paramedics. Finally, Dr. Manchandia testified that Mays was treated for a stab wound to the chest the same day. The evidence against defendant was thus overwhelming even without Mays's testimony.

Defendant contends that she was prejudiced by the use of May's preliminary hearing testimony concerning her intoxication. Defendant argues that Mays's testimony that defendant was drunk damaged her intoxication defense, because he later

"downplay[ed]" that claim. First, Mays did not downplay his testimony that defendant was intoxicated, rather he stated that he did not smell alcohol on her, but could tell she was drunk from her behavior. Second, we do not follow defendant's logic. Far from causing prejudice, Mays's intoxication testimony benefitted defendant, as the jury apparently relied on it to acquit her of attempted murder and convict her instead of the lesser crime of attempted voluntary manslaughter. (See generally, *People v. Walker* (1993) 14 Cal.App.4th 1615, 1622-1623; § 29.4.)

Because the evidence given by other witnesses was overwhelming and uncontradicted, we conclude that the verdict would have been the same absent Mays's prior testimony. We thus agree with respondent that if the trial court had erred in admitting the preliminary hearing testimony, any such error would have been harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
               CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

9