Filed 8/18/20  P. v. Anthony CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DION ANTHONY,<br><br>    Defendant and Appellant. | B295757<br><br>(Los Angeles County<br> Super. Ct. No. MA061302) |

APPEAL from a judgment of the Superior Court for Los Angeles County, Shannon Knight, Judge.  Affirmed.

Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Dion Anthony appeals from a judgment sentencing him to 25 years to life in prison after a jury found him guilty of first degree murder (Pen. Code,[1] § 187, subd. (a)).  He raises two issues on appeal.  First, he contends the trial court erred by denying his motion to dismiss the information based upon the People's failure to comply with the Interstate Agreement on Detainers (§ 1389).  Second, he contends the court erred by admitting the preliminary hearing testimony of one of the prosecution's witnesses after finding that the prosecution exercised due diligence in attempting to secure the witness's presence at trial.  We conclude the record supports the trial court's determinations as to both issues.  Accordingly, we affirm the judgment.

## BACKGROUND

In 2013, Lydia Castillo lived in a two-bedroom mobile home in Lancaster.  She was in a non-exclusive dating relationship with defendant, whom she called Ace.  Defendant lived in Colorado, but had family (including two teenage sisters) in Lancaster and often visited the area.  One of those visits occurred in mid-June 2013.[2]  On the night of June 18, Castillo and defendant spent the night at the home of defendant's great-aunt, Carolyn Walls.  They left Walls's home at around noon on June 19.

---

[1]     Further undesignated statutory references are to the Penal Code.

[2]     Unless otherwise stated, further references to dates are to the year 2013.

The next morning, on June 20, defendant went to Walls's house to pick up his sisters, who were living there. He told Walls that he was taking his sisters, by bus, to Colorado, and he asked Walls for money to buy his sisters' bus tickets. Although Walls gave him the money, defendant drove his sisters to Colorado in Castillo's car.

A.    *Discovery of Castillo's Body and Investigation*

Castillo was close to her younger sister, Rosalina Lozano, and the two spoke almost every day. On the afternoon of June 19, Lozano invited Castillo over to her home for dinner. Castillo declined, telling Lozano that she was meeting with defendant. Over the next few days, Lozano and other family members tried to contact Castillo, but were unable to reach her. On June 23, Lozano and her stepfather, Pedro Ramirez, went to Castillo's home. Castillo's car was missing and the front door and security door were unlocked. Ramirez went inside, and found Castillo's body in her bedroom.

Lozano called the police. When the deputy sheriffs arrived, they found Castillo's body, which showed signs of decomposition, on the floor of the master bedroom. Her body was partially wrapped in a comforter with small gold tassels, and there was a trail of similar tassels from the living room, down the hallway, to the master bedroom. The door to the other bedroom appeared to have been forced open recently; the door jamb was shattered and there were wood splinters and chunks of wood inside the room. The kitchen and china cabinet appeared to have been ransacked, and Castillo's large screen television, jewelry, and a collection of Jack Daniel's bottles were missing. After Castillo's family

3

members were interviewed, defendant was deemed a suspect in the homicide.

Information regarding Castillo's missing car was entered into a nationwide alert system. On June 25, Detective Ray Lugo, the investigating officer, received a report that Castillo's car had been involved in a police pursuit in Englewood, Colorado, and that three people were arrested; defendant was not one of the arrestees. Detective Lugo flew to Colorado on June 27 and interviewed the three arrestees, one of whom was Kahlil Phillips, who had been driving Castillo's car during the pursuit. According to Phillips, defendant told him the car belonged to his fiancée, who was staying in defendant's apartment, and she gave defendant permission to let Phillips use it for a week to get to and from work.[3] Defendant told him "there's a body on the car," meaning the car was connected to a death.

An autopsy of Castillo's body revealed that she had a fracture on her lower lumbar vertebrae. The medical examiner testified that the fracture could have been caused by a fall from a significant height, such as from the second or third story of a building, a high fence, or a tree (although there probably would be some broken bones accompanying the injury in such a case, and they were not present in this case), or by sustained pressure or force being applied to Castillo's spine, such as by someone putting a knee on her back while she was on her stomach and

---

[3]     Phillips could not be located at the time of trial, so his testimony from the preliminary hearing was read to the jury.

applying a lot of force. The medical examiner determined the cause of death to be homicide by asphyxia.

B. *Defendant's Admission to Tammie Huff*

Tammie Huff is defendant's cousin. In November, she had a conversation with her boyfriend (a police informant) that was secretly recorded; the recording was played for the jury. During that conversation, Huff said that defendant told her Castillo had given him a disease and laughed about it. Defendant said that they fought, and that he choked her with his belt until she could not breathe. He told her that he took Castillo's car to Denver and gave it to someone; he said he told that person that he had "killed the bitch." That person was supposed to take the car to a chop shop but he got into a crash before he made it to the chop shop.

A week before the trial, the prosecutor interviewed Huff; a recording of the interview was played for the jury. During the interview, Huff at first denied repeatedly that she ever spoke with defendant about Castillo's murder. After being told there was a recording of her, she ultimately admitted that defendant told her that he strangled Castillo with a belt "[b]ecause she gave him something he can't get rid of" and laughed about it.

At trial, Huff denied ever talking to defendant about Castillo's murder.

C.    *Defendant's Testimony*

Defendant testified at trial as follows.  He travelled to California several times, and stayed with Castillo during some of those trips.  He and Castillo were intimate, but not exclusive.  On June 19, he and Castillo went to a bar.  He had asked Castillo to get him some cocaine; before they went into the bar she gave him what he thought was cocaine, but Castillo told him sometime after he ingested it that it was crystal methamphetamine.  He had never taken crystal methamphetamine before, and he began to panic.

They eventually left the bar, and defendant drove them back to Castillo's home.  Defendant was angry.  Castillo tried to calm him down, but he decided he wanted to leave and go to his girlfriend Brittany's house.  He went into Castillo's bedroom to gather his belongings.  Castillo was jealous and started arguing with him, telling him, "Go ahead and go back to her.  That's why both of you guys have something can't get rid of now."  Defendant believed Castillo meant that she had given him a sexually transmitted disease, and asked her what she had given him.  Castillo made light of it and said, "You'll have to find out for yourself."  Defendant was furious, and kicked his leg backward at the door of the second bedroom, breaking it open, off its hinges.  Castillo grabbed onto defendant's shirt to try to keep him from leaving, and defendant forcefully pushed her away; she fell through the bathroom doorway onto the floor.  Castillo told defendant that she had hurt her back.  Defendant helped her get up and walked her into her bedroom. He got her under the covers, gave her what he thought was pain

6

medication (although it turned out to be Benadryl), and waited until Castillo fell asleep.

Because Castillo had made threats that her relatives would come after defendant if he hurt her, defendant was worried that she would call her family once she woke up. He believed that Castillo owned a pistol, so he searched her home for it, but could not find it. He decided to leave and take Castillo's car. At first he thought he would just use it to go to the bus station (he and his sisters were planning to take the bus to Colorado) and leave the car there, but then he thought he should just pick up his sisters and drive them all the way to Colorado. So, he took Castillo's television and jewelry so he could pawn them for gas money along the way. He thought he would abandon the car once he and his sisters got to Colorado so it could be found and returned to Castillo.

After defendant arrived in Colorado, he found out from a news report that Castillo had died. He was surprised because he did not think he had hurt Castillo enough to have caused her death. He told Phillips, whom he had met earlier, that there was a body on the car (by which he meant it belonged to a deceased person), and that the police might be looking for it. Phillips told him he knew of a chop shop, so defendant told him he could take it there and keep the money he got for the car.

D.    *Closing Arguments, Verdict and Sentence*

The prosecution argued that defendant's version of what happened was inconsistent with the evidence presented and the injuries Castillo suffered. Instead, he argued that defendant killed Castillo by

7

kneeling on her back as he strangled her with his belt, as defendant told Huff, and then ransacked her house looking for valuables. He asked the jury to find defendant guilty of first degree murder.

Defense counsel (who had conceded in his opening statement that defendant had killed Castillo, but argued he was guilty only of voluntary manslaughter) argued there was reasonable doubt that defendant had killed Castillo, but even if the jury concluded otherwise, the only appropriate verdict would be voluntary manslaughter.

The jury found defendant guilty of murder in the first degree, and the trial court sentenced him to a term of 25 years to life in prison. Defendant timely filed a notice of appeal from the judgment.

## DISCUSSION

A.     *Denial of Defendant's Motion to Dismiss*

Defendant contends the trial court erred in denying his motion to dismiss the complaint against him based upon the prosecution's failure to comply with the Interstate Agreement on Detainers. We conclude the trial court correctly found the Interstate Agreement on Detainers did not apply.

1.     *The Interstate Agreement on Detainers*

"The Interstate Agreement on Detainers [the IAD] is a compact among 48 States, the District of Columbia, Puerto Rico, the Virgin Islands, and the United States." (*Carchman v. Nash* (1985) 473 U.S. 716, 719 (*Carchman*).) In California, it is codified as section 1389 of the Penal Code.

"A detainer is a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent." (*Carchman, supra,* 473 U.S. at p. 719.) The IAD "'facilitates the resolution of detainers, based on untried indictments, informations or complaints in one jurisdiction, lodged against persons who have "entered upon a term of imprisonment" in another jurisdiction.'" (*People v. Lavin* (2001) 88 Cal.App.4th 609, 612 (*Lavin*).)

"'The IAD establishes a procedure by which a prisoner against whom a detainer has been lodged may demand trial within 180 days of a written request for final disposition properly delivered to the prosecutor and appropriate court of the prosecutor's jurisdiction. (§ 1389, art. III, subd. (a).) The failure of the state receiving the request to act in compliance with the IAD and the 180-day limit results in dismissal of the pending criminal charges with prejudice. (§ 1389, art. V, subd. (c); [citation].)'" (*Lavin, supra,* 88 Cal.App.4th at pp. 612-613.)

Under the IAD, the official having custody of the prisoner must "promptly inform [the prisoner] of the source and contents of any detainer lodged against him." (§ 1389, art. III, subd. (c).) To start the running of the 180-day period, the prisoner must give or send a written notice and request for final disposition "to the warden, commissioner of corrections or other official having custody of him." (§ 1389, art. III, subd. (b).) The custodial official must then forward the prisoner's written notice and request for final disposition "to the prosecuting officer and the appropriate court of the prosecuting officer's

jurisdiction," along with "a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner." (§ 1389, art. III, subd. (a); see also art. III, subd. (b).) If the prisoner is not brought to trial in the jurisdiction that lodged the detainer within 180 days after the court receives the request for final disposition and accompanying certificate, the court must dismiss the indictment, information, or complaint with prejudice. (§ 1389, art. V, subd. (c).)

    2.    *Relevant Facts*

A criminal complaint charging defendant with murder was filed by the Los Angeles District Attorney on November 13, 2013. It appears that on that same date, an arrest warrant was issued and was entered into the National Crime Information Center (NCIC) maintained by the Federal Bureau of Investigation.

In July 2014, defendant pled guilty to aggravated robbery in Colorado and was sentenced to 12 years in prison. The Colorado Department of Corrections (Colorado DOC) conducted an assessment of defendant around the time of his conviction, and prepared a document entitled "Diagnostic Narrative Summary" (Colorado DOC Summary). A section of that document addressed defendant's criminal history and citizenship/immigration status, and included the following subsection:

10

"E.  DETAINERS/WARRANTS:  YES
"County:  LOS ANGELES, CA
"Docket #:  2AV04489
"Conviction:  HOMICIDE - MURDER
"Class Felony:  UNKNOWN
"Sentence:  PENDING
"Date of Offense:  DATE OF WARRANT 11/13/201 [*sic*]
"Date of Sentence:  PENDING
"Source:  NCIC
"Brief Description of Offense:  Offender said detectives spoke to him about who was driving a vehicle when someone was murdered.  He said he told detectives he would not speak to them without an attorney.
*FULL EXTRADITION"

In August 2014, the Los Angeles District Attorney began the process to extradite defendant from Colorado to California for trial on the murder charge.  On January 9, 2015, Governor Edmund G. Brown, Jr.'s office sent to the extradition/clemency coordinator for Colorado an executive agreement for the extradition of defendant.  On September 29, 2015, officials in California were notified by Colorado's "Detainer Operations Supervisor" that defendant was "available for pick up on the Executive Agreement."

In the meantime, in December 2014, defendant sent two handwritten documents—a one-page "Petition for Writ of Habeas Corpus Ad Prosequendum" and a one-page "Demand for Speedy Disposition of Detainer"—to the Antelope Valley branch of Los Angeles Superior Court.  The documents were filed by the court on February 17, 2015.  Both documents listed the case number as 2AV04480, which was a case in which defendant was charged in August 2012 with a

11

misdemeanor violation of Lancaster City Ordinance section 9.20.030 (prohibiting the consumption of alcoholic beverages on public streets or parking lots). In the demand for speedy disposition, however, defendant stated that the "DETAINER AND OR WARR[A]NT" charged defendant with homicide-murder; the case number for the murder case (i.e., the present case) is MA061302.[4]

Sometime in 2015—after Governor Brown had sent the executive agreement for extradition of defendant for the Colorado governor's signature—the Colorado DOC provided defendant with a document (on Colorado DOC letterhead) entitled "DETAINER NOTICE/ADVISEMENT OF RIGHTS."[5]

In November 2015, defendant filed a motion to dismiss the murder complaint under section 1389. Defendant filed another motion to dismiss under section 1389 on August 17, 2017.[6] In the August 2017

---

[4]    Upon receipt of defendant's demand for speedy disposition, the court in the misdemeanor case (2AV04489) ordered that case dismissed under section 1385.

[5]    The copy of this document included in the record on appeal is not very clear, and the date on it is illegible. However, defendant's counsel stated to the trial court that the detainer notice/advisement of rights was dated May 11, 2015. The record also includes two other documents associated with this notice: a form request for final disposition of detainer signed by defendant and a Colorado DOC certificate of inmate status dated August 27, 2015, which was addressed to the Los Angeles District Attorney's office. It is unclear whether these documents were delivered to the appropriate authorities in California; defendant's motions to dismiss under the IAD did not mention them.

[6]    We note that defendant was represented by the Law Offices of the Public Defender when the original motion was filed, but was represented by

12

motion, defendant asserted, based upon the Colorado DOC Summary, that "[a]t the time of [defendant's] entry into the custody of the [Colorado DOC] . . . there was a pending detainer from Los Angeles County, requesting 'full extradition' of [defendant] for a charge of 'homicide-murder.'" He contended that the February 17, 2015 filing of his hand-written demand for speedy disposition of the detainer was sufficient to start the 180-day period to bring him to trial on the murder charge, and, since he had not been brought to trial within that time the murder charge against him must be dismissed. In opposition, the prosecution argued that no detainer was filed in Colorado in this case, and that, in any event, defendant's handwritten demand failed to satisfy the requirements of the IAD.

The motion was argued a few days before the trial began. The court found there was no detainer lodged with the Colorado DOC by the prosecution. Instead, "there was simply an outstanding warrant that had been entered into the national database as happens as a matter of course with all warrants," which the Colorado DOC discovered when it ran defendant on intake after his conviction. The court found that the notice of detainer defendant received from prison authorities in 2015 did not establish that the Los Angeles District Attorney's office lodged a detainer, because it was a document generated by the Colorado DOC that merely advised defendant that he was wanted by the Los Angeles District Attorney's office for murder.

---

the Law Offices of the Alternate Public Defender when the subsequent motion was filed.

### 3. *Defendant's Contention on Appeal*

On appeal, defendant contends the trial court erred in finding no detainer was lodged by the Los Angeles District Attorney's office. Relying upon *In re Blake* (1979) 99 Cal.App.3d 1004, he argues that an arrest warrant has been held to constitute a detainer under the IAD, noting that "'detainer' has been defined to mean simply 'a written notification, filed with the institution in which a prisoner is serving a sentence, advising the institution that such prisoner is wanted to face pending criminal charges in another jurisdiction.'" (Quoting *In re Blake*, *supra*, 99 Cal.App.3d at p. 1021.) Thus, he concludes that "[a]t the time of [defendant's] entry into the custody of the [Colorado DOC] . . . there was a pending detainer from Los Angeles County" because "the homicide warrant operated as a detainer."

We do not dispute that an arrest warrant may, under certain circumstances, constitute a detainer. But those circumstances are not present in this case.

As noted, the IAD requires for its application that a detainer be "lodged" against the prisoner who has "entered upon a term of imprisonment" in another jurisdiction (§ 1389, art. III, subd. (a)), i.e., the detainer must be "filed by a criminal justice agency with the institution in which a prisoner is incarcerated." (*Carchman*, *supra*, 473 U.S. at p. 719.) This requires both (1) an affirmative act by the prosecutor of the untried charges to lodge the detainer with the appropriate authorities, and (2) that at the time of lodging, the prisoner be serving a term of imprisonment. Neither of these is shown here.

As the Attorney General observes, the lodging of a detainer is discretionary with the district attorney; the district attorney can decide *not* to file a detainer and proceed instead by way of an extradition request to the Governor of the state in which the prisoner is incarcerated. (*People v. Rhoden* (1989) 216 Cal.App.3d 1242, 1251; *People v. Castoe* (1978) 86 Cal.App.3d 484, 490.) As the prosecution demonstrated here, that is what occurred in this case.

Defendant argues, however, that even where the prosecuting authority seeks to obtain the prisoner's presence by means other than a detainer (such as extradition), the filing of an arrest warrant can trigger the operation of the IAD, as was the case in *United States v. Mauro* (1978) 436 U.S. 340. What defendant overlooks is that in *Mauro*, the prosecuting authority lodged the arrest warrant with the officials of the institution where the prisoner was incarcerated. (*Id.* at p. 346 ["federal officials lodged the federal bank robbery warrant as a detainer against him with the state prison authorities"].) That did not happen here. Instead, the arrest warrant for defendant merely was entered into NCIC, a national database, and was not filed with any prison authorities. Indeed, defendant was not serving a term of imprisonment at the time the warrant was entered into NCIC, and therefore it could not have been lodged with the appropriate authorities.

Throughout his argument on appeal, defendant simply ignores the language of the IAD requiring that the detainer be "lodged" with the officials having custody of the prisoner. We cannot ignore that language, especially because the lodging of a detainer triggers duties on

15

the part of the custodial officials to provide notice to the prisoner of the detainer and to inform him of his rights under the IAD. (See *People v. Oiknine* (1999) 79 Cal.App.4th 21, 28 ["'While it is true that the IAD's provisions are to be "liberally construed," . . . this does not warrant a disregard of the clear language and structure of the IAD'"].) Because there was no evidence establishing that the Los Angeles District Attorney's office lodged a detainer for defendant with the Colorado DOC, we conclude the trial court correctly denied defendant's motion to dismiss.

B. *Admission of Khalil Phillips's Preliminary Hearing Testimony*

Defendant contends the trial court prejudicially erred by admitting into evidence Khalil Phillips's preliminary hearing testimony, because the prosecution failed to exercise due diligence in trying to secure Phillips's presence of Phillips at trial. We conclude the court did not err.

1. *Relevant Background*

Defendant's preliminary hearing, at which Khalil Phillips testified, took place on May 8, 2018. At that time, Phillips was in custody (in Colorado) on a probation violation, and was brought to California to testify. While in California, Phillips told the prosecutors that he had 30 days left on the probation violation; the Englewood, Colorado police officer who accompanied Phillips to California, Sergeant Edward Disner, told the prosecutors that Phillips likely would be in custody even longer, and that he would be under the supervision of the

16

probation department once he was released. Phillips also told Detective Lugo, the investigating officer on defendant's case, that he would return for the trial, because that was part of his probation agreement.

The information charging defendant with first degree murder was filed on May 21, 2018, and defendant was arraigned the following day. The matter was continued multiple times for various matters. On September 28, 2018, the trial court continued the case to December 7, 2018, for the pretrial hearing, as day 0 of 42. At the pretrial hearing on December 7, 2018, the trial court set dates for the readiness conference (Jan. 2, 2019), the hearing on defendant's motion to dismiss (Jan. 11, 2019), and jury trial (Jan. 14, 2019).

Ten days before the pretrial hearing, on November 27, 2018, one of the prosecutors,[7] Matthew P. Allen, contacted Detective Lugo. He told the detective that he expected the trial to begin in January 2019, and he asked the detective to check to see if Phillips was still in custody. If he was, he asked Detective Lugo to start the process to get Phillips ordered out for the trial. If Phillips was out of custody, Allen asked Detective Lugo to find out if Phillips would agree to come to California and testify; if not, Allen said they would need to organize an out of state subpoena for him. Allen followed up with Detective Lugo on December 17, 2018, asking if he had been able to find out if Phillips was still in custody. When Allen contacted Detective Lugo again on December 28, 2018, the detective told him he had arranged for Sergeant Disner to locate Phillips.

---

[7]     There were two prosecutors on defendant's case.

17

In late December 2018, Sergeant Disner began searching for Phillips. He learned that Phillips had been released from jail and was on probation in the 18th Judicial District of Colorado under the supervision of Arapahoe County. He ran Phillips's criminal history and discovered he had been listed as transient in his last several contacts and arrests. He led a team of officers from the Englewood Police Department in trying to locate Phillips at his previous known addresses, based on Phillips's prior contacts with law enforcement that were entered into the Colorado Crime Information Computer (CCIC) system. He also contacted Phillips's probation officer to get updated information about his whereabouts, but the probation officer said that Phillips had failed to meet with her as required by the terms of his probation. She told Sergeant Disner that she was working on a warrant affidavit that she would send to the Arapahoe County District Attorney's Office.

On January 2, 2019, Allen contacted Detective Lugo, who told him that Phillips had been released from custody and was homeless. Allen immediately obtained an out of state subpoena and sent it to the Arapahoe County District Attorney's office so that office could begin the process of setting a hearing in Colorado. That same day, Allen spoke to Sergeant Disner, who told him about the efforts he had made up to that point. Allen also spoke to Terri Combs at the Arapahoe County District Attorney's office. Combs told Allen that she would assign Debbie Knox, a process server, to look for Phillips, and she would instruct Knox to work with Sergeant Disner.

Sergeant Disner spoke with Knox the next day. She told him that she checked government records and Lexis Nexus for addresses associated with Phillips. She said she would be using her team of process servers to locate and serve Phillips.

On January 7, 2019, the probation violation warrant for Phillips was entered into the CCIC system. That same day, Sergeant Disner ran a "query query" (a search to see if other law enforcement agencies had queried Phillips's name), and he and his team contacted the agencies who recently had queried Phillips. Those agencies included the Jefferson County Sheriff's Office, Lakewood Police Department, Aurora Police Department, Denver Police Department, and the Denver Sheriff's Office. None of those agencies had any updated contact information or other information that could lead to the location of Phillips. Sergeant Disner and his team also contacted several other law enforcement agencies based upon prior CCIC entries regarding Phillips. In addition, Sergeant Disner contacted the Fugitive Location and Apprehension Group (FLAG) for assistance. FLAG is a group, made up of officers from several agencies, that was formed for the sole purpose of finding and arresting fugitives. FLAG was unable to locate Phillips.

On January 8, Knox contacted Phillips's mother at her home. She told Knox that Phillips did not live there, that she did not know where he was, and she did not have a phone number for him. She also did not know if Phillips was working. Knox checked with the Colorado Department of Labor to see if Phillips had any work wages. The Department showed that the last time wages were reported for Phillips was in 2017.

19

On January 9, 2019, Combs sent an email to Allen to tell him that Knox had not been able to locate and serve Phillips. She also said that she had spoken to Sergeant Disner and Phillips's probation officer, and neither had been able to locate Phillips. Therefore, Combs said that her office was not going to be able to serve Phillips in time for the hearing on the out of state subpoena, which was scheduled for January 10, 2019.

2. *Prosecution's Motion and Hearing on the Motion*

The prosecution brought a motion to admit Phillips's preliminary hearing testimony on January 14, 2019, the first day of trial. The motion included declarations from Allen and Sergeant Disner in which each man described the efforts they had made to try to secure Phillips's presence at trial, as well as email correspondence from Sergeant Disner, Combs, and Knox discussing their efforts to locate and serve Phillips.

The court held a hearing on the motion that same day, at which Sergeant Disner testified. Sergeant Disner stated that he received a call from Detective Lugo in December 2018, asking him to assist in locating Phillips. He began looking for Phillips sometime late that month, shortly before or on Christmas. He described the efforts he and his team made to locate Phillips, including the people and agencies they contacted. In addition to Sergeant Disner's testimony and the declarations and exhibits attached to the motion, the prosecution submitted the F.B.I. rap sheet for Phillips. The rap sheet showed that Phillips had been arrested several times between the time of the preliminary hearing and the start of defendant's trial, including two arrests in December 2018: one by the Lakewood (Colorado) Police

20

Department on December 8, 2018 and another by the Broomfield (Colorado) Police Department on December 11, 2018.

Defense counsel argued that the prosecution had failed to show what specific actions had been taken by the various parties in Colorado; he contended that Sergeant Disner's testimony regarding what he believed they had done was insufficient because he had not followed up to find out if those actions actually had been taken. Counsel also argued that the efforts to locate Phillips should have started earlier. The prosecutor argued that the prosecution's efforts to return Phillips to testify began the day of the preliminary hearing, when they received assurances from Phillips that he would come back, and were told that he would be supervised by the probation department once he was released from custody. The prosecutor also noted that once the prosecution learned that Phillips had been released from custody, they immediately engaged the assistance of a process server and her team, Sergeant Disner and his team, and the Arapahoe County District Attorney's office.

The trial court asked the prosecutor whether Phillips was kept in custody either time he was arrested in December 2018, or when he was released. The prosecutor responded it was his understanding that he was not kept in custody, but he did not have any specific information. The court said it wanted to hear what Detective Lugo had done to try to locate Phillips between November 27, 2018, when Allen asked him to check on Phillips's custody status, and January 2019, when the search for Phillips appeared to have begun in earnest. The court continued the hearing on the motion to allow further testimony.

The hearing resumed two days later, on January 16, 2019. Sergeant Disner testified that he and his team had continued to look for Phillips since the earlier hearing. He contacted Andy Kuritz, the filing officer with the Safe Streets Task Force, several times. Officer Kuritz told him that he put out an alert through "Leads On Line," which is an on-line service that notifies him if Phillips pawns any items or sells a cell phone through Eco A.T.M.; Officer Kuritz reported that he had not received any alerts. Officer Kuritz also checked homeless shelters, but did not find Phillips in any of them. In addition, he contacted the Lakewood Police Department Special Response Team, which searched through homeless areas in the City of Lakewood, as well as the areas where Phillips had been arrested in the past, but they were unable to locate Phillips. Officer Kuritz also checked CCIC earlier that day (the day of Sergeant Disner's testimony), and told Sergeant Disner there were no additional queries for Phillips, and there were two outstanding warrants (one out of the Lakewood Police Department and one out of the Colorado Probation Department).

Sergeant Disner also testified about the most recent times Phillips had been in custody. He was in custody on a case from Broomfield on June 14, 2018; he was remanded on June 20, 2018, and given 18 months of probation. He abandoned probation, and on November 26, 2018, a complaint was filed and a warrant issued. Phillips then was detained by the Lakewood Police Department on December 8, 2018 and sentenced on December 19, 2008 to 30 days in jail, with 21 days served, plus good time. When Sergeant Disner checked on or shortly after Christmas, Phillips no longer was in custody.

22

After Sergeant Disner testified, the court again continued the hearing on the prosecution's motion, which resumed on January 18, 2019. On that date, after hearing argument from the prosecution and defense counsel, the court observed that "it's very clear that additional efforts could have been made and probably should have been made to locate Mr. Phillips[,] and certainly it would appear that it would have been a good idea to begin those efforts earlier." But the court also noted that Phillips had given assurances to the prosecutor and investigating officer that he would cooperate, return voluntarily for trial, and would maintain contact with his probation officer when he was released from custody. Therefore, the prosecutors did not have reason to believe until recently that Phillips was not cooperative and was not reporting to his probation officer. The court concluded: "I think that certainly there are issues as far as the timing, but at least as of relatively recently, the end of December, it does appear to the court that reasonable diligence has been exercised in an effort to locate Mr. Phillips. Certainly I think we can all agree not everything that could have been done was done and the efforts were not started as soon as we all would have liked, but the fact that additional efforts could have been made is not dispositive. It's the test of the efforts that were made. [¶] So based on that finding of reasonable diligence the court does find . . . Mr. Phillips to be unavailable pursuant to Evidence Code section 240 and the People will be permitted to read in his preliminary hearing testimony."

3.   *Defendant's Contention on Appeal*

Defendant contends the trial court erred in finding the prosecution had used due diligence to secure Phillips's presence at trial, and therefore his constitutional rights to due process and to confront and cross-examine the "primary" witness against him were violated. We disagree.

The confrontation clauses of the state and federal Constitutions grant criminal defendants the right to confront the witnesses against them.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.)  "Although important, the constitutional right of confrontation is not absolute. [Citations.]  'Traditionally, there has been "an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant [and] which was subject to cross-examination . . . ." [Citation.]'  [Citation.]  Pursuant to this exception, the preliminary hearing testimony of an unavailable witness may be admitted at trial without violating a defendant's confrontation right.  [Citation.]"  (*People v. Herrera* (2010) 49 Cal.4th 613, 621.)

In California, this exception is codified in section 1291 of the Evidence Code.  Subdivision (a)(2) of that section "provides that 'former testimony,' such as preliminary hearing testimony, is not made inadmissible by the hearsay rule if 'the declarant is unavailable as a witness,' and '[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the

24

hearing.' Thus, when the requirements of [Evidence Code] section 1291 are met, the admission of former testimony in evidence does not violate a defendant's constitutional right of confrontation." (*People v. Herrera*, *supra*, 49 Cal.4th at p. 621, fn. omitted.)

In the present case, defendant does not contest that he was a party to the preliminary hearing and that he had the right and opportunity to cross-examine Phillips at that hearing. Thus, the only issue is whether Phillips was "unavailable as a witness." (Evid. Code, § 1291, subd. (a).) Under Evidence Code section 240, a declarant is "'unavailable as a witness'" if he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).)

"[T]o establish unavailability, the prosecution must show that its efforts to locate and produce a witness for trial were reasonable under the circumstances presented." (*People v. Herrera*, *supra*, 49 Cal.4th at p. 623.) "'What constitutes due diligence to secure the presence of a witness depends upon the facts of the individual case. . . . The totality of efforts of the proponent to achieve presence of the witness must be considered by the court. Prior decisions have taken into consideration not only the character of the proponent's affirmative efforts but such matters as whether he reasonably believed prior to trial that the witness would appear willingly and therefore did not subpoena him when he was available [citation], whether the search was timely begun, and whether the witness would have been produced if reasonable diligence had been exercised [citation].'" (*People v. Sanders* (1995) 11

25

Cal.4th 475, 523.) "We review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard [citation], and independently review whether the facts demonstrate prosecutorial good faith and due diligence." (*People v. Herrera, supra,* 49 Cal.4th at p. 623.)

Defendant asserts that the prosecution failed to show due diligence in this case because (1) the search should have begun earlier, particularly since Phillips was out-of-state; (2) Phillips's testimony was critical to the prosecution's case, and therefore "it was incumbent on the prosecution to take its duty to secure his attendance very seriously"; and (3) Phillips was not a very credible witness. We are not persuaded.

First, although the trial court indicated that the efforts to find Phillips could have started earlier, it found that the prosecution had no reason to believe—based upon Phillips's assurances he would cooperate and the fact that he would be required to maintain contact with his probation officer when released from custody—that Phillips would be difficult to locate when needed for trial. The record supports that finding. Moreover, the record shows that, at the prosecution's request, Sergeant Disner began looking for Phillips on or about December 25, 2018, almost three weeks before the trial was set to begin. As the Supreme Court has observed, "'we could not properly impose upon the People an obligation to keep "periodic tabs" on every material witness in a criminal case, for the administrative burdens of doing so would be prohibitive.'" (*People v. Fuiava* (2012) 53 Cal.4th 622, 676.) Given Phillips's assurances to the prosecutors, and the fact that he was to be under the supervision of his probation officer once released from

26

custody, we conclude that it was reasonable to begin the search for Phillips three weeks before the trial was scheduled to begin. (See, e.g., *Id.* at pp. 675-676 [it was reasonable to begin search two weeks before the date set for trial].)

Second, while Phillips's testimony was helpful to the prosecution's case, he certainly was not the "primary" witness, as defendant asserts. In fact, Phillips was mentioned only five times in either side's closing arguments. The prosecution referred to Phillips once during the opening argument, when listing the people who defendant lied to; he observed that defendant lied when he told Phillips that Castillo, who he said was his fiancée and was up in his apartment, said that Phillips could use her car. Defense counsel also mentioned Phillips once during his closing argument, stating: "And if you believe [defendant] told Kahlil Phillips there's a body on this car and that means that he is telling Mr. Phillips that he killed her, it's still a voluntary manslaughter." But defendant himself admitted during his testimony that he told Phillips "there was a body on the car." Then, in the prosecution's final closing, Phillips was mentioned three times, mostly in passing. First, the prosecution referred to Phillips's testimony that defendant referred to Castillo as his fiancé as one of two examples to show that defendant was "a casual liar." With the remaining two mentions of Phillips, the prosecution sought to show that portions of defendant's admission to Huff about how he killed Castillo was corroborated by Phillips's testimony regarding defendant giving him Castillo's car. Far from being the "primary" witness, Phillips was primarily a corroborating witness. Instead, the primary witness for the

27

prosecution was Huff, which is reflected by the jury's request for a read-back of all of her testimony, but did not ask for any other witness' testimony.

Finally, defendant fails to explain how the "fact" that "Phillips was a witness of dubious credibility" is relevant to determining whether the prosecution exercised due diligence in securing Phillips's attendance at trial. To the extent defendant suggests that this "fact" demonstrates that the prosecution could not reasonably have believed Phillips's promise to voluntarily appear at trial (although he does not expressly argue this), we observe that the prosecution did not rely solely on Phillips's promise to appear, but also on the fact that Phillips would be under the supervision of his probation officer once he was released from custody, and that his agreement to testify would be a condition of his probation. We find that under the circumstances, it was reasonable for the prosecution to rely on Phillips's promise to appear, given that he would be under the supervision of his probation officer.

In short, in light of Phillips's promise to appear, the fact that he was going to be under the supervision of his probation officer and therefore presumably easy to locate, and the evidence establishing the extensive efforts made over the course of more than three weeks to locate Phillips, we conclude the trial court did not err in finding the prosecution exercised due diligence in attempting to locate Phillips and secure his presence at trial. Therefore, the court properly declared Phillips an unavailable witness and allowed his preliminary hearing testimony to be read at trial.

28

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.

We concur:


MANELLA, P. J.


COLLINS, J.